**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**NORTH AMERICAN SPORT KARATE ASSOCIATION INC.**, a Minnesota corporation,

**Plaintiff,**

**v.** **Case No.: 6:26-cv-00752-GAP-RMN**

**WORLD TOUR PROMOTERS, LLC**, a Florida limited liability company,
**MICHAEL McCOY**, an individual,
**PRO-KICK PRODUCTIONS, LLC,** a Florida limited liability company,
**AKI ENTERPRISES LLC,** a Missouri limited liability company,
**MON ART QUEBEC,** a Canadian corporation,
**13579441 CANADA, INC.,** a Canadian corporation,
**TRUTH ENTERTAINMENT LLC,** a Tennessee limited liability company,
**DON RODRIGUES KARATE ACADEMY, LTD.,** a Rhode Island corporation,

**Defendants.**
______________________________/

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL, PERMANENT INJUNCTIVE RELIEF REQUESTED**

Plaintiff, North American Sport Karate Association Inc. ("***Plaintiff***"), by and through its undersigned counsel, files this First Amended Complaint against

Defendants, World Tour Promoters, LLC ("***World Tour***"), Michael McCoy ("***McCoy***"), Pro-Kick Productions, LLC ("***Pro-Kick***"), AKI Enterprises LLC, Mon Art Quebec, 13579441 Canada, Inc., Truth Entertainment LLC, and Don Rodrigues Karate Academy, Ltd. (collectively, "***Defendants***"), and states as follows:

**Nature of This Action**

1. This is a civil action for trademark infringement, unfair competition and false designation of origin, violation of the Anticybersquatting Consumer Protection Act, tortious interference, and civil conspiracy arising under the federal Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and 1125(d), and under common law.

2. This action concerns Defendants' attempted takeover of Plaintiff's well-known "North American Sport Karate Association" business, commonly known as NASKA.

3. With rights dating back to 1986, Plaintiff is engaged in the sanctioning, rating, regulation, administration, and promotion of competitive sport karate tournaments across the United States and internationally under the names and marks "North American Sport Karate Association" and NASKA (the "***NASKA business***").

4. Plaintiff owns United States Registration No. 7,721,429 for the NASKA mark, registered March 11, 2025.

5. Plaintiff also owns valuable common law rights and goodwill in all the names, marks, and design logos used in connection with the NASKA business,

including "North American Sport Karate Association," NASKA, the current NASKA design logos, and all similar variants used to identify Plaintiff's NASKA business (the "**NASKA marks**").

6. Defendant World Tour is a newly-formed Florida limited liability company created by Defendants in March 2026. World Tour did not exist before March 2026 and has no rights or interest in the NASKA business or marks.

7. Defendant McCoy is an owner and the Chief Executive Officer of co-Defendant Pro-Kick. McCoy has long known that Plaintiff and its predecessors owned and controlled the NASKA business and marks. As early as 1990, McCoy formed a Florida corporation called "NASKA Ratings, Inc." and sought authority from and contracted with Plaintiff's predecessor, also named "North American Sport Karate Association, Inc.," to administer ratings and membership functions. McCoy's company monetarily benefited from that relationship for years.

8. Defendant McCoy's current claim that the NASKA business and marks are instead owned by a separate, continuing, promoter-controlled "unincorporated association" is contradicted by his own historical conduct, his own writings, his company's contractual dealings, Pro-Kick's long-running waiver forms, NASKA's trademark filings, the conduct of NASKA officials, and McCoy's own recent admissions that Mr. Carnahan was the "President, Owner and the only one with any authority and power" over NASKA.

9. Defendants now seek to rewrite history. Defendants have formed World Tour, asserted ownership over the NASKA business and marks, registered and used an infringing <naskatour.com> domain name, created and used an infringing NASKA-branded website and social media accounts, used current NASKA logos, claimed to be Plaintiff and Plaintiff's authorized leadership, and interfered with Plaintiff's relationships with promoters, competitors, sponsors, vendors, administrators, and members of the sport karate community.

10. Despite Plaintiff's demands, Defendants have refused to cease and desist from their willfully infringing use of the NASKA names and marks, unfair competition, false designation of origin, cyberpiracy, and tortious interference.

11. Plaintiff seeks injunctive relief, damages, Defendants' profits, statutory damages, attorneys' fees, costs, interest, and all other relief available under law and at equity.

12. All conditions precedent to the institution and maintenance of this action have occurred or have been performed by Plaintiff.

13. Plaintiff has engaged the law firm of Shumaker, Loop & Kendrick, LLP to represent it and has obligated itself to pay its attorneys a reasonable fee for their services in this action.

**Parties, Jurisdiction, and Venue**

14. Plaintiff North American Sport Karate Association Inc. is a Minnesota corporation with its principal place of business in Shoreview, Minnesota. Plaintiff was formed on January 26, 2021. A true and correct copy of Plaintiff's Certificate and Articles of Incorporation is attached hereto as **Exhibit 1**.

15. Plaintiff conducts its activities throughout the United States (including Florida) and internationally, relating to the sanctioning, rating, regulation, administration, and promotion of competitive sport karate tournaments under the NASKA marks.

16. Larry R. Carnahan ("***Mr. Carnahan***") is the sole incorporator and sole shareholder of Plaintiff. Mr. Carnahan is also associated with JLB Productions, Inc., the promoter of the Diamond Nationals, a NASKA-sanctioned sport karate tournament.

17. Hunter Lyon ("***Mr. Lyon***") is the President of Plaintiff and serves on Plaintiff's Board of Directors and Executive Committee. Mr. Lyon is also the President of AKA Warrior Cup LLC, the promoter of AKA Warrior Cup, a NASKA-sanctioned sport karate tournament that takes place annually in Chicago, Illinois.

18. Defendant World Tour Promoters, LLC is a Florida limited liability company newly formed on March 9, 2026, effective March 4, 2026, with an address in Newberry, Florida. True and correct copies of a printout of World Tour's

company information from the Florida Department of State, Division of Corporations website and Articles of Organization are attached hereto as **Exhibits 2** and **3**, respectively.

19. Defendant Michael McCoy is an individual residing in Florida. McCoy purports to hold the title of President of World Tour and claims to be the President of the "NASKA Board of Directors." McCoy is also an owner, Manager, and the Chief Executive Officer of co-Defendant Pro-Kick.

20. Defendant Pro-Kick Productions, LLC is a Florida limited liability company with an address in Newberry, Florida that is the same as that of co-Defendant World Tour. Pro-Kick signed co-Defendant World Tour's Articles of Organization as a member or authorized representative of World Tour and is a Manager of World Tour. *See* **Exhibit 3.** Pro-Kick is the promoter of the U.S. Open ISKA World Martial Arts Championships (the "***U.S. Open***"), a NASKA-sanctioned sport karate tournament that takes place annually in Orlando, Florida.

21. Defendant AKI Enterprises LLC is a Manager of World Tour and the promoter of the AmeriKick Internationals, a NASKA-sanctioned sport karate tournament that takes place annually in Atlantic City, New Jersey.

22. Defendant Mon Art Quebec is a Manager of World Tour and the promoter of the Quebec Open, a NASKA-sanctioned sport karate tournament that takes place annually in Quebec City, Canada.

23. Defendant 13579441 Canada, Inc. is a Manager of World Tour and the promoter of the Toronto International Tournament of Martial Arts Champions, a NASKA-sanctioned sport karate tournament that takes place annually in Toronto, Canada.

24. Defendant Truth Entertainment LLC is a Manager of World Tour and the promoter of the Battle of Atlanta, a NASKA-sanctioned sport karate tournament that takes place annually in Atlanta, Georgia.

25. Defendant Don Rodrigues Karate Academy, Ltd. is a Manager of World Tour and the promoter of the Ocean State Grand Nationals, a NASKA-sanctioned sport karate tournament that takes place annually in Warwick, Rhode Island.

26. Defendants Pro-Kick, AKI Enterprises LLC, Mon Art Quebec, 13579441 Canada, Inc., Truth Entertainment LLC, and Don Rodrigues Karate Academy, Ltd. are collectively referred to in this Complaint as the "**Promoter Defendants**."

27. The federal law claims of trademark infringement, unfair competition, and cyberpiracy asserted in this action arise under the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq*. This Court has original jurisdiction over these claims pursuant to 15 U.S.C. § 1121(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1338(a) in that this Complaint states an action based upon a federal question relating to trademarks.

28. The state law claims of common law trademark infringement, unfair competition, tortious interference, and civil conspiracy asserted in this action are so related to the federal law claims asserted in this action that they form part of the same case or controversy under Article III of the United States Constitution. This Court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(a).

29. This Court also has original jurisdiction over the state law claims of common law trademark infringement, unfair competition, tortious interference, and civil conspiracy asserted in this action pursuant to 28 U.S.C. § 1338(b) because they are joined with substantial and related claims asserted under the Lanham Act, 15 U.S.C. § 1051 *et seq*.

30. This Court has personal jurisdiction over Defendants pursuant to Florida Statutes § 48.193(1)(a) because Defendants are domiciled in Florida, organized under Florida law, conduct business in Florida, operate or promote NASKA-related events in Florida, formed Defendant World Tour in Florida, operate World Tour in Florida, created or used an infringing website and social media accounts directed to Florida and national audiences, and/or have been engaging in tortious acts in Florida.

31. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because Defendants, having subjected themselves to personal

jurisdiction in this judicial district, reside in this judicial district, and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this Complaint occurred or are occurring in this judicial district.

## Common Factual Allegations

### A. The Founding and Early Years of the North American Sport Karate Association.

32. The "North American Sport Karate Association," commonly known as "NASKA," has existed in the sport karate community since 1986.

33. The North American Sport Karate Association traces its origins back to the national sport karate rating and tournament circuit previously associated with Karate Illustrated Magazine ("***KI***").

34. In the 1970's and 1980's, KI developed a national competitive sport karate circuit, sanctioned national tournaments, classified events, and published competitor ratings.

35. KI continued this service until approximately 1986, when it announced its intention to shift its focus away from sport karate sanctioning and rating.

36. Following KI's decision, certain promoters of prominent sport karate tournaments discussed forming a successor sanctioning, rating, and rules system. The objective was to continue a national ratings system, refine the system,

implement standardized rules, and allow competitors to earn points toward national rankings.

37. Sanctioning was and is critical to a tournament's success because top martial artists generally seek to participate in tournaments where results count towards rankings and ratings.

38. These discussions culminated in a meeting at the U.S. Open in Orlando, Florida in November 1986, where a group of promoters agreed their tournaments would participate in a sanctioning, rating, and regulation system to be called the "North American Sport Karate Association" or "NASKA."

39. Tournaments that met to-be-developed NASKA standards would be permitted to hold themselves out as NASKA-sanctioned and use the NASKA name and design logos for the limited purpose of identifying their tournaments as NASKA-sanctioned events.

40. This early group included promoters associated with tournaments such as the Diamond Nationals (Mr. Carnahan's tournament), AKA Warrior Cup (Mr. Lyon's tournament), U.S. Open (Pro-Kick's tournament), Battle of Atlanta, New England Open, Ocean State Grand Nationals, Bluegrass Nationals, U.S. Capitol Classics, and a few other tournaments that no longer exist.

41. The early group of promoters did not incorporate, form a limited liability company, partnership, joint venture, or any other form of statutory entity under any state's laws.

42. No written bylaws, shareholders agreement, operating agreement, partnership agreement, joint venture agreement, membership ledger, share ledger, property ledger, assignment agreement, or joint trademark ownership or concurrent use agreement was created in 1986 placing ownership or control of the NASKA marks in a separate legal entity called the "NASKA Unincorporated Association."

43. No promoter intended to create a partnership or joint venture by which another promoter could act as their agent or bind them in any way, nor did the promoters agree in any way to share in the profits or losses of a separate NASKA business.

44. To the extent the early participants operated informally, they did so as a promoter council or advisory body that collaborated on sanctioning, ratings, regulation, divisions, rules, and event participation.

45. If any unincorporated association or informal promoter group existed in 1986, there was no continuous and legally cognizable membership body capable of owning and transferring trademark rights from 1986 to 1989. Indeed, the first couple years of the North American Sport Karate Association were marked by infighting, promoters coming and going, and a revolving door of leaders.

46. Defendants now claim that a legally distinct, property-owning "NASKA Unincorporated Association" existed continuously from 1986 until 2026 and owned the NASKA business and marks. That claim is false, internally inconsistent, unsupported by the historical record, and contradicted by Defendants' own conduct.

47. Even if some unincorporated association or informal promoter council or advisory body was created in 1986, there has not over time been a cognizable membership body capable of owning and transferring 1986 trademark rights to World Tour in 2026.

48. Many of the original 1986 promoters are no longer involved, and some are deceased. Many events have changed hands. And many current alleged "members" are corporations or limited liability companies that did not exist in 1986, did not own the relevant tournaments in 1986, and did not acquire written assignments of any alleged NASKA ownership interests from the original 1986 promoters.

49. Defendants have alternately described the alleged "members" as promoters, events, board members, tournament owners, corporate entities, and "board positions." These inconsistent descriptions show that Defendants' claimed association is too indefinite and amorphous to have owned and transferred the NASKA marks.

50. An "event" is not a juridical person capable of owning trademarks, voting, assigning rights, holding equity, or transferring goodwill. To the extent Defendants contend that tournaments or events themselves were the "members," such contention fails because events are not legal persons.

51. To the extent Defendants contend that current corporate or limited liability company owners of events are members, Defendants must prove how those entities acquired any alleged rights from original individual promoters and how such rights transferred through decades of changes in tournament ownership. They cannot do so.

52. To the extent Defendants contend that individual promoters were the members, Defendants must prove that each individual promoter assigned any alleged membership and trademark rights to later tournament owners or corporate entities. They cannot do so.

53. At most, the historical record shows a collaborative and advisory promoter structure that provided input regarding NASKA-sanctioned events. It does not show a separate legally-existing, property-owning association with the ability to acquire, own, hold, or assign the NASKA marks to Defendant World Tour in 2026.

54. From the date the promoter group met at the U.S. Open in 1986 through the mid-1990s, the group did not actually perform rating services for NASKA-sanctioned tournaments, but instead relied on third parties to perform such services.

**B. The 1989 Corporation.**

55. On or about March 10, 1989, Mr. Carnahan incorporated the NASKA business in Minnesota under the name "North American Sport Karate Association, Inc." (the "***1989 Corporation***"). A true and correct copy of the Business Record Details for the 1989 Corporation from the Minnesota Department of State website is attached hereto as **Exhibit 4**.

56. The 1989 Corporation was formed to formalize, operate, and administer the NASKA business, including NASKA sanctioning, rating, regulation, membership, rules, tournament participation, and use of the NASKA marks.

57. The promoters involved at the time were aware and consented to Mr. Carnahan incorporating the NASKA business. When Mr. Carnahan incorporated the NASKA business, he and the other promoters allowed their joint ownership rights in the NASKA marks to pass to the 1989 Corporation. Such rights dated back to the first use of the marks in 1986.

58. The 1989 Corporation did not initially perform rating services, but instead contracted with Reeves Rating Systems to perform such services on its behalf.

59. After the contract with Reeves Rating Systems ended, Defendant McCoy saw an opportunity and in 1990 formed a new Florida corporation named "NASKA Ratings, Inc." NASKA Ratings, Inc. contracted with the 1989

Corporation to perform rating services for NASKA-sanctioned tournaments and competitors on behalf of the 1989 Corporation.

60. Attached as **Exhibit 5** is a true and correct copy of a 2-page fax Mr. Carnahan received from Defendant McCoy on or about July 27, 1994.

61. The fax is on the header of "NASKA Ratings, Inc.," the company Mr. McCoy created in 1990.

62. Defendant McCoy states on the first page of the fax that "in November of 1989, I agreed to undertake the task of ratings director for NASKA Inc." This reference to "NASKA, Inc." is to the 1989 Corporation, which was regularly called "NASKA, Inc." as an abbreviated reference for "North American Sport Karate Associarion, Inc." He continues "[i]n January of 1990 I formed a company called NASKA Ratings, Inc. to handle this business."

63. So by McCoy's own written admission, he was fully aware of the existence of the 1989 Corporation and its ownership and operation of the NASKA business at least as early as November of 1989, when he agreed to be the 1989 Corporation's ratings director.

64. The second page of the fax lays out a "Proposed Outline for NASKA, Inc. and NASKA Ratings, Inc." "NASKA, Inc." is identified as "a Minneapolis corporation."

65. The proposal identifies how NASKA Ratings, Inc. will provide certain rating and membership services to NASKA, Inc. (i.e. the 1989 Corporation).

66. In exchange for the services, Mr. McCoy proposed that "NASKA, Inc. will . . . [p]rovide exclusive use of the NASKA name in conjunction with point karate ratings."

67. It is clear that Defendant McCoy considered the 1989 Corporation to be the owner of the NASKA marks, from which NASKA Ratings, Inc. needed a license. McCoy's proposal is a direct admission that McCoy understood the 1989 Corporation to own the NASKA marks and be the entity capable of authorizing the use of the marks in connection with ratings and membership.

68. Defendant McCoy's proposal is inconsistent with his present claim that an unincorporated promoter association of some sort, rather than the 1989 Corporation, owned and controlled the NASKA business and marks.

69. If Defendants McCoy or Pro-Kick were equal co-owners of the NASKA marks at the time, McCoy would not have needed the 1989 Corporation to authorize use of the NASKA marks by NASKA Ratings, Inc.

70. From approximately 1990 to 1996, NASKA Ratings, Inc. and McCoy monetarily benefited from its relationship with the 1989 Corporation by providing ratings and membership services in exchange for collecting and retaining membership income and ratings fees.

71. Defendant McCoy did not object during that period that the 1989 Corporation lacked authority to contract for NASKA ratings or to authorize use of the NASKA marks.

72. Defendant McCoy accepted the benefits of the 1989 Corporation's authority when doing so was profitable for him and his company.

73. Defendants now take the opposite position only because they seek to seize control of Plaintiff's NASKA business and marks.

74. Defendant McCoy's 1990 through 1996 course of dealing is evidence that the 1989 Corporation controlled the quality and source-identifying functions of the NASKA brand, including ratings and membership.

75. The ratings and membership functions were not peripheral. They were core elements of the goodwill associated with the NASKA business and marks.

76. Defendant McCoy's historical recognition of the 1989 Corporation as the contracting and authorizing party defeats Defendants' current contention that the 1989 Corporation was a secret, unauthorized, irrelevant, or non-owning entity.

77. When the agreement with NASKA Ratings, Inc. ended, the 1989 Corporation picked up and going forward provided the NASKA sanctioning/rating/regulating services. The sanctioning/rating/regulating business was known as the "North American Sport Karate Association" or "NASKA," and

NASKA-sanctioned tournaments were permitted to use the NASKA marks to indicate they were sanctioned, with the permission of the 1989 Corporation.

78. Although the 1989 Corporation (solely owned by Mr. Carnahan) owned and operated the NASKA sanctioning/rating/regulating business, it at all times consulted with the promoters of NASKA-sanctioned tournaments in an effort to form consensus and set direction.

79. As discussed above, the promoters wanted and needed the sanctioning/rating/regulating system, but without the promoters' buy-in and participation as NASKA-sanctioned tournaments there would be no need for the services of the 1989 Corporation. Mr. Carnahan plotted the course of the 1989 Corporation based on the overall wishes of the promoters, and in this sense considered the 1989 Corporation's business to be a "democracy."

80. The 1989 Corporation owned and operated the NASKA sanctioning/rating/regulating business until its administrative dissolution on or about February 25, 2013.

81. From the date the 1989 Corporation was formed to the date it was administratively dissolved on February 25, 2013, Mr. Carnahan was at all times the sole shareholder, corporate director, and officer of the corporation.

82. The 1989 Corporation had a registered office at 600 Sherwood Road, Shoreview, Minnesota 55126, and a registered agent at that address.

83. The 1989 Corporation had a Federal Employer Identification Number issued by the IRS of 41-1635871.

84. The 1989 Corporation opened and used bank accounts.

85. The 1989 Corporation filed tax returns and paid taxes.

86. The 1989 Corporation entered into contracts for various goods and services related to its NASKA sanctioning/rating/regulating business, including the contract with Defendant McCoy's entity "NASKA Ratings, Inc."

87. The 1989 Corporation registered "NASKA" as an assumed name. *See* **Exhibit 6** attached hereto (Certificate of Assumed Name). The purpose of an assumed name registration (or "DBA" – "doing business as") is to provide public notice of the true owner of a business operating under a name other than their legal name. The 1989 Corporation published the fact it was using the assumed name NASKA.

88. None of the acts and occurrences discussed above were kept from anyone, specifically including the promoters of NASKA-sanctioned events.

89. The 1989 Corporation regularly and publicly distributed information in which it referenced itself as "NASKA Inc." *See* **Composite Exhibit 7** attached hereto.

90. For Defendant McCoy's part, he was specifically aware since 1989 of the existence, operations, and trademark ownership of the 1989 Corporation as evidenced by the above-discussed fax from McCoy to Mr. Carnahan.

91. Also attached hereto as **Exhibit 8** are a series of waiver forms used by Defendant McCoy's entity Pro-Kick for its U.S. Open tournament. The waiver forms specifically include "North American Sport Karate Association, Inc." as a "Released Party."

92. Equally notable is the name that does **NOT** appear as a "Released Party" in the Waiver Form—"North American Sport Karate Association" (without the "Inc.")—consistent with the fact the NASKA promoters never were or considered themselves to be an unincorporated association, until they decided to try to rewrite history in the last couple months.

93. The form includes a number of other apparently unincorporated associations as "Released Parties," such as the Florida Sport Karate Association and North American Grapplers Association, so Defendants Pro-Kick and McCoy obviously knew the significance of adding the term "Inc."

94. The absence of an unincorporated "North American Sport Karate Association" from the Waiver Form is only consistent with the fact that Mr. Carnahan's corporation—North American Sport Karate Association, Inc.—had owned and been running the NASKA business for years and owned the NASKA

marks, a fact of which Defendants McCoy, Pro-Kick, and the rest of the promoters were well aware.

95. Defendant Pro-Kick has used a similar Waiver Form that includes reference to "North American Sport Karate Association, Inc." for nearly 20 years and still uses such a Waiver Form today. *See* **Exhibit 8**. Defendants Pro-Kick and McCoy have for many years been aware of both Mr. Carnahan's corporations and their ownership of the NASKA marks.

96. Indeed, as recently as November of 2025, Defendant McCoy, in an email to Mr. Carnahan copied to the Promoter Defendants and others, acknowledged Mr. Carnahan's ownership of the NASKA business stating:

> Larry,
>
> If you want to call a Board meeting to dissolve the EC you have that authority. Starting your email with the comment that you no longer have a vote is simply not true.
>
> **Your call, you're the President, Owner and the only one with any authority and power at this point. Until we have bylaws that state otherwise, there isn't even a Board.**
>
> Please let me know how you want us to proceed.
>
> Incredibly frustrated,
> MM

*See* **Exhibit 9** attached hereto (email chain) (emphasis added). These statements by McCoy just months ago directly contradict his more recent fabrication in this action

that neither Mr. Carnahan nor his owned and controlled corporations ever owned anything.

### C. The 1991 Federal Registration

97. During the period of time the 1989 Corporation owned and operated the NASKA business, the corporation federally registered with the United States Patent and Trademark Office ("***USPTO***") the NASKA mark as part of a design logo:

98. The trademark application was filed on January 4, 1990, and United States Registration No. 1,633,489 for the mark issued on January 29, 1991. A true and correct copy of the '489 registration is attached hereto as **Exhibit 10.**

99. As with all trademark applications filed with the USPTO, this application was published for opposition by anyone who believed they would be damaged by the registration of the mark.

100. No opposition was filed by anyone, and the mark was registered and remained on the USPTO's Principal Register for ten (10) years, until it was canceled when the 1989 Corporation missed a maintenance filing for the registration.

101. Pursuant to 15 U.S.C. § 1072, though, the '489 registration served as notice of the 1989 Corporation's claim of ownership of the NASKA mark, including

as notice to Defendants Pro-Kick, McCoy, and all others involved with the North American Sports Karate Association. No one at the time objected or claimed any inconsistent rights in the NASKA name and mark.

102. The promoters involved with the North American Sport Karate Association at the time were aware of the 1989 Corporation's claim of ownership of the NASKA marks, and the filing of the trademark application that matured into the '489 registration.

**D. The Dissolution of the 1989 Corporation and Continuation of the NASKA business.**

103. The 1989 Corporation owned and operated the NASKA business for nearly twenty-five years until it was administratively dissolved by the State of Minnesota on February 25, 2013 for failure to maintain required corporate filings. *See* **Exhibit 4**.

104. Pursuant to Minnesota Statutes § 302A.725, upon dissolution of a corporation, all tangible and intangible property of the dissolved corporation, after the discharge of, or after making adequate provision for the discharge of, the debts, obligations, and liabilities of the corporation, is distributed to the dissolved corporation's shareholders by operation of law in accordance with the Minnesota Statutes.

105. Accordingly, upon the 1989 Corporation's dissolution in 2013, all its remaining property, including, but not limited to, the NASKA marks, was distributed to Mr. Carnahan as the corporation's sole shareholder.

106. From the date of the dissolution of the 1989 Corporation, Mr. Carnahan, as successor to the 1989 Corporation, continued to personally own and operate the NASKA business until his formation of, and assignment of rights to, Plaintiff, at all times exercising control over its operations, direction, and use and ownership of the NASKA marks.

107. As discussed above, though, over the North American Sport Karate Association's history it maintained a board of advisors, comprised of individuals in the sport karate industry whose input and advice Mr. Carnahan regularly sought.

108. For the most part, the promoters of the top-rated tournaments in the NASKA system comprised this board, which was referred to by all involved by various names, including the "NASKA Board."

109. To be clear, though, from the time the 1989 Corporation began running the NASKA business, no member of this board other than Mr. Carnahan, and much later Mr. Lyon, was a stockholder, corporate director, or officer of either the 1989 Corporation or Plaintiff.

110. This board served in an advisory capacity to Mr. Carnahan, but was not a board of directors with any sort of governance authority, ownership, or control over the 1989 Corporation, Mr. Carnahan, or Plaintiff.

111. Irrespective of Mr. Carnahan's right to control, though, he at all times tried to run the business as a democracy, consulting with the promoters, building a consensus among them, holding votes of the "NASKA Board," and setting the course of the business generally in accordance with the desires of a majority of the promoters.

112. Consistent with the ownership and control of the NASKA business by Mr. Carnahan, Defendant McCoy expressly admitted in November 2025 the members of this board at all times recognized a veto power on the part of Mr. Carnahan. *See* **Exhibit 9.**

**E. Re-Incorporation of the NASKA Business.**

113. In 2021, Mr. Carnahan began the process of cleaning up and re-formalizing the organizational structure of the North American Sports Karate Association, which he had been personally running since the dissolution of the 1989 Corporation.

114. On January 26, 2021, Mr. Carnahan incorporated the NASKA business in the State of Minnesota as a new corporation by filing Articles of Incorporation with the Minnesota Secretary of State under File Number 1213153300023. *See*

**Exhibit 11** attached hereto (Articles of Incorporation). Mr. Carnahan was the sole incorporator. *See* **Exhibit 11**. Similar to the 1989 Corporation, the new corporation was named "North American Sport Karate Association Inc."

115. The Articles of Incorporation authorize Plaintiff (the corporation formed in 2021) to issue a maximum of one (1) share of stock. *See* **Exhibit 11**.

116. At the time of Plaintiff's formation, Mr. Carnahan was issued Plaintiff's sole authorized share of common stock (Share No. 1) in exchange for value received, including his contribution of the NASKA marks, goodwill, and associated assets and operations to Plaintiff. *See* **Exhibit 12** attached hereto (Uncertificated Share Notice issued under Minnesota law).

117. Mr. Carnahan has continuously held Share No. 1 of Plaintiff from the date of its issuance to the present date. At no time has Mr. Carnahan sold, transferred, assigned, or otherwise disposed of any ownership interest in such share.

118. Mr. Carnahan is, and has at all relevant times been, the sole record and beneficial owner of one hundred percent (100%) of the issued and outstanding shares of common stock of Plaintiff. *See* **Exhibit 13** attached hereto (Stock Ledger).

119. In connection with Plaintiff's formation, Mr. Carnahan contributed and assigned to Plaintiff all right, title, and interest he held in the NASKA business, NASKA marks, and associated assets.

120. Mr. Carnahan executed a Trademark Assignment dated January 26, 2021, assigning to Plaintiff all right, title, and interest in and to the NASKA marks. A true and correct copy of this Trademark Assignment is attached hereto as **Exhibit 14**.

121. Following Plaintiff's formation in 2021, Plaintiff owned and operated the NASKA business.

122. Like the 1989 Corporation, Plaintiff had a registered office at 600 Sherwood Road, Shoreview, Minnesota 55126, and a registered agent at that address. It took in membership and sanctioning fees and opened and used bank accounts. It contracted with third parties for various goods and services related to its NASKA sanctioning/rating/regulating business.

123. Defendants were well aware of Plaintiff's incorporation. For example, on November 26, 2025, in the course of an email discussion regarding the proposed restructuring of the NASKA Board, Executive Committee, and its subcommittees, Defendant McCoy stated "Larry has a draft of the bylaws for several days since he would to [sic] file them for the corporation." *See* **Exhibit 9** (email chain). Defendant McCoy had long been aware of Mr. Carnahan's 2021 incorporation of "North American Sport Karate Association Inc." *See* **Exhibit 8** (including 2022, 2025, and 2026 waivers referencing "North American Sport Karate Association Inc. (NASKA)").

124. The "NASKA Board" participated in Plaintiff's activities and conducted NASKA-sanctioned events under the authority of Plaintiff, without objection to the corporate structure, Mr. Carnahan's sole ownership of Plaintiff, or Plaintiff's ownership of the NASKA business and marks. Indeed, as Defendant McCoy admitted some four years after the formation of Plaintiff, evidencing his clear and unmistakable knowledge of Plaintiff's existence, Mr. Carnahan was "the President, Owner and the only one with any authority and power" over the NASKA business.

**F. The Current Status of the NASKA Mark.**

125. As part of the formalization of the NASKA business, Mr. Carnahan also pursued again a federal trademark registration for the NASKA mark.

126. On June 10, 2024, Plaintiff filed a new application with the USPTO for registration of the NASKA mark (Serial No. 98/592,441).

127. On March 11, 2025, the USPTO issued U.S. Registration No. 7,721,429 to Plaintiff for the NASKA mark for services in International Class 41, including:

> Martial arts instruction; organizing sporting events, namely, karate competitions and tournaments; conducting martial arts competitions; conducting martial arts tournaments; entertainment in the nature of martial arts tournaments; providing a website featuring blogs and non-downloadable publications in the nature of articles, brochures, blog posts, and videos in the field of martial

arts; and providing online non-downloadable videos in the field of martial arts.

A true and correct copy of the '429 registration is attached hereto as **Exhibit 15**.

128. Consistent with the chain of title tracing back to Mr. Carnahan's initial interest in the NASKA mark in 1986, the registration identifies a first use date in 1986. *See* **Exhibit 15**.

129. This registration is valid and subsisting and has not been cancelled, revoked, or abandoned.

130. This registration serves as prima facie evidence of the validity of the registered NASKA mark and of the registration of the mark, of Plaintiff's ownership of the registered NASKA mark, and of Plaintiff's exclusive right to use the registered NASKA mark in commerce.

131. Plaintiff owns valuable rights and goodwill in the NASKA marks. Plaintiff and its predecessors-in-interest have expended a great deal of time and effort over the years building and promoting the NASKA brand, resulting in substantial goodwill and recognition within the sport karate community.

132. As a result of Plaintiff's and its predecessors' continuous use, promotion, and operation under the NASKA marks, the widespread use of the marks in connection with sport karate sanctioning, rating, regulation, administration, and promotion, and the quality of the services provided under the marks, the NASKA marks have come to be, and now are, well and favorably known to the trade and

public. The marks are a means by which Plaintiff's services are identified as originating with Plaintiff.

133. As a result of Plaintiff's and its predecessors' use and promotion of the NASKA marks, valuable goodwill in the organization as represented by the marks has been generated. The goodwill is symbolized by the marks, and Plaintiff owns the goodwill and the marks.

134. Plaintiff's rights in the NASKA marks are senior to any rights of Defendant World Tour. Indeed, Defendant World Tour has no rights in the marks at all.

135. The "NASKA Board" has never opposed any of Mr. Carnahan's efforts to formalize the association, including the incorporation, adoption of governance documents, or the pursuit of trademark registration, until recently when Defendants attempted to hijack the business.

**G. Appointment of Hunter Lyon as President.**

136. Mr. Lyon has been associated with NASKA for many years, serving in leadership roles managing ratings, memberships, and other NASKA functions for Plaintiff and before it Mr. Carnahan.

137. Recently, Mr. Carnahan, as sole shareholder of Plaintiff, officially made Mr. Lyon a part of Plaintiff's corporate structure, appointing him a Director and the President of Plaintiff.

138. On March 16, 2026, Mr. Carnahan, as the sole shareholder of Plaintiff, executed a Resolution of the Sole Shareholder that, among other things, ratified the issuance of Plaintiff's sole share to Mr. Carnahan, removed all existing members of the board (including anyone claiming without authorization to be a member), and appointed a new Board of Directors and Executive Committee. *See* **Exhibit 16** attached hereto (Resolution of the Sole Shareholder).

139. On March 17, 2026, the newly constituted Board of Directors of Plaintiff executed a Resolution of the Board of Directors formally re-appointing Mr. Lyon as President of Plaintiff, with full authority to act on behalf of Plaintiff in all matters consistent with the direction of the Sole Shareholder and the Board of Directors. *See* **Exhibit 17** attached hereto (Resolution of the Board of Directors).

140. On March 11, 2026, Plaintiff's corporate counsel issued a formal demand letter to all concerned parties, including all promoters, administrators, and individuals acting on behalf of or in connection with Plaintiff, notifying them of the corporate governance actions taken and demanding immediate compliance. The demand letter confirmed that Mr. Lyon was duly appointed as President of Plaintiff and demanded that all individuals immediately cease and desist from any and all unauthorized use of Plaintiff's social media accounts, websites, email accounts, domain names, logos, trademarks, trade names, and any other corporate assets or intellectual property. *See* **Exhibit 18** attached hereto (Demand Letter).

## H. Defendants' Infringement.

141. Going back at least to 2020, Defendant McCoy began scheming with the co-owner of Defendant Pro-Kick and others to seize control of the NASKA business from Mr. Carnahan. *See* July 23, 2020 email from Defendant McCoy to Mike Sawyer of Pro-Kick and others attached hereto as **Exhibit 19**.

142. In Defendant McCoy's July 23, 2020 email, he first proposed that the group "***reincorporate*** NASKA with 6 owner entities [which would have] equal ownership and voting rights" (emphasis added). *Id.* This statement about "reincorporating" again evidences Defendant McCoy's clear and unmistakable knowledge of the previous existence and lapse of the 1989 Corporation, which he more recently disavowed to serve Defendants' current narrative.

143. Defendant McCoy continued that his plan would "allow [Mr. Carnahan] to retain ***part ownership***" (emphasis added). *Id.* This once again evidences Defendant McCoy's clear and unmistakable knowledge of Mr. Carnahan's complete ownership of the NASKA business in 2020.

144. Defendant McCoy then laid out two alternatives in the event Mr. Carnahan decided not to acquiesce:

> 1. "[W]e 5 own NASKA and retain [Mr. Carnahan] as a paid employee or not depending on his willingness to participate;" or
>
> 2. "[W]e leave and start a new company and all 5 events leave NASKA. He will be left with the other events and

> will have a new competitor. NASKA will not survive 6 months, which would be a shame but might be necessary."

*Id.* What is clear is that one way or another Defendant McCoy and the co-conspirators receiving the email were at the time scheming to steal the NASKA business and marks, which they all knew and admitted were owned by Mr. Carnahan. Defendant McCoy orchestrated this scheme.

145. Although nothing happened immediately at the time of this July 23, 2020 email, towards the end of 2025, due to a series of events in Mr. Carnahan's life, Mr. Carnahan began to consider stepping back from the NASKA business.

146. On or about March 3, 2026, Mr. Carnahan publicly announced he would be stepping back as President of Plaintiff and had appointed Mr. Lyon as the new President of Plaintiff.

147. Defendant McCoy has recently claimed that less than a week before this retirement announcement, on February 26, 2026:

> [T]he NASKA Board as a whole voted unanimously to convert the NASKA Unincorporated Association into World Tour Promoters, LLC, a modern limited liability company organized under Florida law, and to assume Board member positions within WTP. On March 26, 2026, McCoy executed an assignment of the rights to the NASKA Marks from the NASKA Unincorporated Association to WTP. Each Board member of NASKA became an equal member of WTP with one vote. Despite this conversion, the members of the WTP Board continued to be referred to in the industry as NASKA Board members, and tournaments sanctioned by the previously-

> unincorporated association continued to be referred to as NASKA-sanctioned tournaments.

This statement by Mr. McCoy, made under oath and penalties of perjury, is indisputably false, and inconsistent with the events that took place after February 26, 2026.

148. According to Defendant McCoy, the promoters of the AKA Warrior Cup and Diamond Nationals, namely Mr. Carnahan and Mr. Lyon, or entities they controlled, were members of the "NASKA Board."

149. Yet neither Mr. Carnahan nor Mr. Lyon knew anything about the alleged vote on February 26, 2026, nor did they participate in any such vote. Accordingly, if there was some sort of vote of the "NASKA Board" that took place on February 26, 2026, it was certainly not unanimous as it excluded Mr. Carnahan and Mr. Lyon.

150. Consistent with Mr. Carnahan's and Mr. Lyon's lack of knowledge and involvement in this alleged vote, when McCoy and the Promoter Defendants formed Defendant World Tour a few days later on March 9, 2026, the only Managers listed were:

- Pro-Kick
- AKI Enterprises LLC
- Mon Art Quebec
- 13579441 Canada, Inc.

- Truth Entertainment LLC
- Don Rodrigues Karate Academy, Ltd.

Neither Mr. Carnahan, Mr. Lyon, nor any entity with which they were associated were included.

151. The foregoing are the "Promoter Defendants," who, led by McCoy and his company Pro-Kick, together conspired to steal the NASKA business and marks from Mr. Carnahan, infringe on Plaintiff's trademark rights, unfairly compete with Plaintiff, illegally register the <naskatour.com> domain name, and tortiously interfere with Plaintiff's business. Defendants, led by Defendant McCoy and his company Pro-Kick, formed Defendant World Tour, which on information and belief has no assets, for the sole purpose of hijacking Plaintiff's business, hoping to at the same time shield their own individual assets from risk.

152. Neither Mr. Carnahan, Mr. Lyon, nor any entity with which they were associated contributed any capital to Defendant World Tour, signed any operating agreement for World Tour, or received any interest or position as a member, director, or officer of World Tour.

153. There has also been a claim that Mr. Lyon resigned some position with Defendant World Tour, but since Mr. Lyon was never offered nor accepted any position with World Tour, he could not have resigned anything. The claim of a resignation is likewise indisputably false.

154. Furthermore, presuming Mr. McCoy signed any such assignment, the assignment would have been invalid and of no effect.

155. Plaintiff owns all right, title, and interest in and to the NASKA marks, as set forth in this Complaint. As such, Mr. McCoy has never had any legal ability to assign any right in such marks to anyone.

156. Even under the arguments being advanced by Defendants, though, namely that all right, title, and interest in and to the NASKA marks belonged to some sort of unincorporated association dating back to 1986, under Florida law property of such an association can only be disposed of by joint, unanimous action of the members of the association.

157. Neither Mr. Carnahan nor Mr. Lyon, nor entities with which they were associated approved or executed any such assignment. That being the case, under the arguments advanced by Defendants, Mr. McCoy could not without Mr. Carnahan's and Mr. Lyon's participation assign any rights in the marks at all to Defendant World Tour.

158. Either way, Defendant World Tour, under the facts and applicable law, neither has, nor ever had, any right, title, or interest in or to the NASKA marks.

159. Despite having no authority from Plaintiff, its sole shareholder, its Board of Directors, or its duly appointed President, Defendant World Tour—formed by Defendant Pro-Kick and acting through Defendant McCoy—has undertaken to

use the NASKA marks without authorization and in a manner likely to cause confusion among the trade and the sport karate community.

160. It is no coincidence Defendant World Tour was formed in the State of Florida only recently on March 9, 2026, effective March 4, 2026 – the day after Mr. Carnahan announced his retirement. *See* **Exhibits 2** and **3**.

161. For McCoy's part, he has been associated with the promoter of a NASKA-sanctioned sport karate tournament (co-Defendant Pro-Kick) and on the "NASKA Board," but has never been a shareholder, corporate director, officer, or employee of Plaintiff.

162. On or about March 9, 2026 (the day Defendant World Tour was formed), some of the advisors, none of whom was a shareholder, corporate director, or officer of Plaintiff, purported to hold an election for "President of the NASKA Board of Directors." Supposedly Mr. Lyon was a candidate in this election, yet Mr. Lyon did not participate in this election in any way, nor did he agree to run in this purported election.

163. Defendant McCoy was declared the winner of this purported election. *See* **Exhibit 20** (Limited Release of Confidential Vote).

164. Defendant World Tour then publicly announced that Defendant McCoy "is now the President of the NASKA Board of Directors and the World Tour

Promoters, LLC (the corporate entity through which the Board operates)." *See* **Exhibit 21** attached hereto (Facebook post).

165. This purported election was unauthorized and without any legitimate corporate authority. The "NASKA Board" was not the Board of Directors of Plaintiff and had no authority to elect officers or take governance actions on behalf of Plaintiff.

166. Since this purported election, Defendants World Tour and McCoy have undertaken to use the NASKA marks in numerous ways without authorization and in a manner likely to cause confusion among the trade and the public, with McCoy at all times being the moving, active, and conscious force behind World Tour's actions.

167. Defendants World Tour and McCoy have used an unauthorized Facebook page[1] and created a new Instagram account[2] using the NASKA marks, through which they hold themselves out to the public as Plaintiff and the authorized leadership of Plaintiff. The unauthorized Facebook page (**Exhibit 22**) and Instagram account (**Exhibit 23**) use the NASKA marks to promote Defendant World Tour's

---

[1] Facebook, NASKA World Tour, https://www.facebook.com/naskaworldtour (last visited Apr. 4, 2026).

[2] Instagram, NASKA World Tour, https://www.instagram.com/naskaworldtour (last visited Apr. 4, 2026).

activities and purport to speak on behalf of Plaintiff, with McCoy purporting to be the leadership of Plaintiff.

168. Defendants World Tour and McCoy have also procured a domain name registration for <naskatour.com> and launched a new website at such domain, purporting to be Plaintiff and the authorized leadership of Plaintiff. *See* **Exhibit 24** (WHOIS search result for <naskatour.com>) and **Exhibit 25** (website). This unauthorized website uses the NASKA marks to promote Defendant World Tour's activities and purports to speak on behalf of Plaintiff, with McCoy purporting to be the leadership of Plaintiff.

169. On information and belief, Defendants World Tour and McCoy have also purported to conduct business on behalf of Plaintiff, including by communicating with promoters, stakeholders, and members of the sport karate community using the NASKA marks, without authorization.

170. Defendants World Tour and McCoy's foregoing actions are causing confusion among the sport karate community and the public as to the source, sponsorship, and affiliation of Defendant World Tour's activities, and are likely to continue to cause confusion, mistake, or deception among the trade and the public.

171. Members of the public encountering Defendant World Tour's Facebook page, Instagram account, website, and communications are likely to

believe, mistakenly, that World Tour's activities are authorized by, affiliated with, or sponsored by Plaintiff, when they are not.

172. By virtue of the foregoing, Defendants World Tour and McCoy are infringing upon Plaintiff's rights in the NASKA marks and unfairly competing with Plaintiff in violation of provisions of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), and applicable state common law, and tortiously interfering with Plaintiff's business relationships.

173. Also, by virtue of Defendants World Tour and McCoy's registration and use of the <naskatour.com> website, Defendants World Tour and McCoy are engaged in cyberpiracy in violation of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d).

174. Despite Plaintiff's demands that Defendants World Tour and McCoy cease and desist from their infringement, unfair competition, cyberpiracy, and tortious interference, Defendants World Tour and McCoy have intentionally, actively, and deliberately refused to comply, have not ceased and desisted from their wrongful use of the NASKA marks, and have intentionally, willfully, and deliberately persisted in their infringement of Plaintiff's trademark rights, unfair competition with Plaintiff, cyberpiracy, and tortious interference.

175. Defendants World Tour and McCoy's intentional and willful infringement of Plaintiff's trademark rights, unfair competition, cyberpiracy, and

tortious interference is causing irreparable injury to Plaintiff, and, unless an injunction is granted, will continue to cause irreparable injury to Plaintiff, due to the confusion, mistake, and deception that will be and has been generated among the trade and the public and business relationships that will be irreparably damaged. Plaintiff has suffered and will continue to suffer damage, the exact amount of damage being unknown to Plaintiff at this time.

176. The damage to Plaintiff is, and will continue to be, irreparable because, among other reasons, of the continuing nature of the trademark infringement, unfair competition, cyberpiracy, and tortious interference, which would necessitate a multiplicity of suits for damages if the continuance of the wrongs is not enjoined.

## COUNT I

### Federal Trademark Infringement and Unfair Competition (Lanham Act) (against Defendants World Tour and McCoy)

177. Plaintiff realleges paragraphs 1 through 176 of this Complaint as if fully restated herein.

178. This is an action for an injunction arising under 15 U.S.C. §§ 1114, 1116, and 1125, and for damages arising under 15 U.S.C. §§ 1114, 1117, and 1125.

179. Defendants World Tour and McCoy have, by virtue of their above-described acts, willfully infringed upon Plaintiff's rights in its federally-registered NASKA mark in violation of 15 U.S.C. § 1114, and have unfairly competed with

Plaintiff by falsely designating their activities as originating with Plaintiff or with a concern legitimately connected with Plaintiff in violation of 15 U.S.C. § 1125.

180. Defendants World Tour and McCoy's above-described acts of infringement and unfair competition have been committed, and are continuing to be committed, with the knowledge that their use of the NASKA mark is intended to be used to cause confusion, or to cause mistake, or to deceive.

181. Defendants World Tour and McCoy's above-described acts of infringement and unfair competition have caused irreparable injury to Plaintiff and will continue to cause irreparable injury to Plaintiff if Defendants are not restrained by this Court from further violating Plaintiff's trademark rights and competing unfairly with Plaintiff due to the confusion, mistake, or deception that will likely be generated among the trade and the public as a consequence of the above-described acts of infringement and unfair competition. Plaintiff has no adequate remedy at law.

WHEREFORE, Plaintiff demands judgment:

1. entering an injunction preliminarily during the pendency of this action, and thereafter permanently, enjoining and restraining Defendants, their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with them, from infringing Plaintiff's trademark rights in the NASKA marks, from unfairly competing with Plaintiff in any manner whatsoever in connection with the operation of their activities, and from continuing to operate in any manner tending to confuse or deceive the public into believing that their activities are in any way connected with, sponsored by, or affiliated with Plaintiff;

2. ordering Defendants to immediately cease all use of the NASKA marks, including, but not limited to, removing or causing to be removed any and all Facebook pages, Instagram accounts, other social media accounts, websites, and other online or offline content using or displaying the NASKA marks;

3. ordering an accounting of and awarding Plaintiff such damages, lost profits, royalties, attorneys' fees, costs, and prejudgment interest, as may be shown by the evidence;

4. awarding up to three (3) times any actual damages sustained by Plaintiff;

5. awarding Plaintiff interest on such profits and damages at the highest rate allowed by law;

6. awarding Plaintiff costs of this action;

7. awarding Plaintiff its reasonable attorneys' fees and costs; and

8. awarding Plaintiff such other and further relief as the Court deems just and proper.

## COUNT II

### Common Law Trademark Infringement and Unfair Competition (against Defendants World Tour and McCoy)

182. Plaintiff realleges paragraphs 1 through 176 of this Complaint as if fully restated herein.

183. This is an action for an injunction and for damages arising under Florida common law.

184. Plaintiff owns valuable common law rights and goodwill in the NASKA marks as a result of its continuous use of the marks in Florida and elsewhere.

185. Defendants World Tour and McCoy have, by virtue of their above-described acts, infringed upon Plaintiff's common law trademark rights and unfairly competed with Plaintiff.

186. Defendants World Tour and McCoy's above-described acts of infringement have been committed, and are continuing to be committed, with the knowledge that their use of the NASKA marks is intended to be used to cause confusion, or to cause mistake, or to deceive.

187. Defendants World Tour and McCoy's above-described acts of infringement have caused irreparable injury to Plaintiff and will continue to cause irreparable injury to Plaintiff if Defendants are not restrained by this Court from further violating Plaintiff's trademark rights due to the confusion, mistake, or deception that will likely be generated among the trade and the public as a consequence of the above-described acts of infringement. Plaintiff has no adequate remedy at law.

WHEREFORE, Plaintiff demands judgment:

1. entering an injunction preliminarily during the pendency of this action, and thereafter permanently, enjoining and restraining Defendants, their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with them, from infringing

Plaintiff's trademark rights and unfairly competing with Plaintiff in any manner whatsoever in connection with the operation of their activities, and from continuing to operate in any manner tending to confuse or deceive the public into believing that their activities are in any way connected with, sponsored by, or affiliated with Plaintiff;

2. ordering an accounting of and awarding Plaintiff such damages, lost profits, royalties, costs, and prejudgment interest, as may be shown by the evidence;

3. awarding Plaintiff interest on such profits and damages at the highest rate allowed by law;

4. awarding Plaintiff costs of this action; and

5. awarding Plaintiff such other and further relief as the Court deems just and proper.

## COUNT III

### Violation of the Anticybersquatting Consumer Protection Act (against Defendants World Tour and McCoy)

188. Plaintiff realleges paragraphs 1 through 176 of this Complaint as if fully restated herein.

189. Plaintiff owns the exclusive rights in and to the NASKA marks.

190. Defendants World Tour and McCoy reserved, registered, and are using the domain name <naskatour.com> (the "***Infringing Domain Name***") knowingly, willfully, and in complete disregard of Plaintiff's exclusive rights in and to the NASKA marks.

191. Defendants World Tour and McCoy reserved, registered, and are using the NASKA mark in the Infringing Domain Name with a bad faith intent to profit from the use of the NASKA marks.

192. The Infringing Domain Name is confusingly similar to the NASKA marks.

193. Defendants World Tour and McCoy reserved, registered, and are using the Infringing Domain Name with the intent to create a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the goods and services promoted and sold on its website.

194. Defendants World Tour and McCoy will continue their acts of cyberpiracy, causing irreparable injury to Plaintiff, unless such activities are enjoined by this Court.

195. As a direct and proximate result of Defendants' unlawful activities, Plaintiff has suffered and will continue to suffer damages in an amount that is not presently ascertainable, but will be established at trial.

WHEREFORE, Plaintiff demands judgment:

1. entering an injunction preliminarily during the pendency of this action, and thereafter permanently, enjoining and restraining Defendants, their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with them, from registering, trafficking in, or using any domain name that is identical or confusingly similar to the NASKA marks, including, but not limited to, the domain name <naskatour.com>;

2. ordering the transfer of the domain name <naskatour.com> to Plaintiff or, in the alternative, ordering the cancellation of the domain name registration for the domain name <naskatour.com>;

3. awarding Plaintiff statutory damages pursuant to 15 U.S.C. § 1117(d) in the amount of not less than $1,000 and not more than $100,000 per domain name, as the Court considers just;

4. awarding Plaintiff its reasonable attorneys' fees and costs;

5. awarding Plaintiff costs of this action; and

6. awarding Plaintiff such other and further relief as the Court deems just and proper.

## COUNT IV

### Tortious Interference with Business Relationships (against Defendants World Tour and McCoy)

196. Plaintiff realleges paragraphs 1 through 176 of this Complaint as if fully restated herein.

197. Plaintiff has ongoing and prospective business relationships with tournament promoters, competitors, sponsors, vendors, administrators, ratings personnel, website and social media administrators, event venues, broadcasters, and members of the sport karate community.

198. These relationships include, without limitation, relationships relating to NASKA sanctioning, ratings, membership, tournament listings, rules, event promotion, website administration, social media administration, competitor participation, sponsorship, and publication of results.

199. Defendants World Tour and McCoy were aware of these relationships and intentionally and wrongfully interfered with them in the manner described in this Complaint.

200. In wrongfully interfering with these relationships Defendants World Tour and McCoy acted without justification.

201. As a direct and proximate result of such wrongful interference Plaintiff has been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff demands judgment:

1. entering an injunction preliminarily during the pendency of this action, and thereafter permanently, enjoining and restraining Defendants, their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with them, from wrongfully interfering with Plaintiff's business relationships;

2. awarding damages in an amount to be proven at trial;

3. awarding Plaintiff interest on such damages at the highest rate allowed by law;

4. awarding Plaintiff costs of this action; and

5. awarding Plaintiff such other and further relief as the Court deems just and proper.

## COUNT V

**Civil Conspiracy**
**(against the Promoter Defendants)**

202. Plaintiff realleges paragraphs 1 through 176 of this Complaint as if fully restated herein.

203. The Promoter Defendants have agreed, either expressly or tacitly, to jointly engage in a common scheme to misappropriate the NASKA name and mark, seize control of the NASKA business, exclude Plaintiff from control of NASKA operations and assets, and divert Plaintiff's goodwill to Defendant World Tour.

204. In furtherance of this conspiracy, the Promoter Defendants committed overt acts, including, but not limited to:

- forming and operating World Tour for the purpose of stealing Plaintiff's NASKA business and marks while hiding behind a newly-formed legal entity (World Tour) with no assets.
- asserting false ownership of and right to use the NASKA marks.
- operating a business under the infringing NASKA marks.
- unfairly competing with Plaintiff in violation of federal and state law by falsely designating the origin of Defendant World Tour's services.
- creating and maintaining an unauthorized NASKA website.
- creating and maintaining unauthorized NASKA social media pages and accounts.
- holding Defendants World Tour and McCoy out to, and communicating with, the public as Plaintiff and the authorized representative of Plaintiff.

- Tortiously interfering with Plaintiff's relationships with martial arts promoters, sponsors, and competitors.

205. These acts were undertaken in furtherance of the conspiracy and were intended to and did result in damage to Plaintiff, including loss of business opportunities, loss of control over the "North American Sport Karate Association" and NASKA brand, and harm to reputation and goodwill.

WHEREFORE, Plaintiff demands judgment:

1. entering an injunction preliminarily during the pendency of this action, and thereafter permanently, enjoining and restraining Defendants, their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with them, from the above-described conspiracy;

2. awarding damages in an amount to be proven at trial;

3. awarding Plaintiff interest on such damages at the highest rate allowed by law;

4. awarding Plaintiff costs of this action; and

5. awarding Plaintiff such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all matters so triable.

Dated: May 15, 2026

Respectfully submitted,

/s/ J. Todd Timmerman
J. Todd Timmerman, Lead Counsel
Florida Bar No. 0956058
ttimmerman@shumaker.com
Samantha A. Regala
Florida Bar No. 1032553
sregala@shumaker.com
Shumaker, Loop & Kendrick, LLP
101 East Kennedy Boulevard
Suite 2800
Tampa, Florida 33602
Telephone: 813-229-7760
Facsimile: 813-229-1660

*Counsel for Plaintiff, North American Sport Karate Association Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 15, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send electronic filing to all counsel of record.

/s/ J. Todd Timmerman
J. Todd Timmerman