**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**NORTH AMERICAN SPORT KARATE ASSOCIATION INC.**, a Minnesota corporation,

**Plaintiff,**

**v.** **Case No.: 6:26-cv-00752-GAP-RMN**

**WORLD TOUR PROMOTERS, LLC,** et al.,

**Defendants.**
___________________________________/

# DEFENDANT WORLD TOUR PROMOTERS, LLC'S FIRST AMENDED COUNTERCLAIMS

For its First Amended Counterclaims against the North American Sport Karate Association, Inc. ("NASKA, Inc."), World Tour Promoters, LLC ("WTP") states and alleges as follows:

## INTRODUCTION

1. This lawsuit stems from a brazen attempt by NASKA, Inc. and its President, Hunter B. Lyon ("Lyon") to rob WTP of its intellectual property rights in the NASKA® name and service mark.

2. This lawsuit arises under the Lanham Act, 15 U.S.C. § 1125(a), and also asserts state law claims.

3. WTP seeks damages in an amount to be proven at trial, plus the reasonable costs and attorney's fees it incurred in bringing this action, as well as injunctive relieve to preclude any further effort by NASKA, Inc. to trample WTP's intellectual property rights and the cancellation of NASKA Inc.'s service mark registration.

**PARTIES, JURISDICTION AND VENUE**

4. WTP is a Florida limited liability company active and in good standing.

5. NASKA, Inc. is a Minnesota corporation active and in good standing.

6. This Court has subject matter jurisdiction under 28 U.S.C. §§1331 and 1338 because this action arises under the Lanham Act.

7. This Court also has supplemental jurisdiction over WTP's state law claims pursuant to 28 U.S.C. § 1367.

8. This Court has authority under 15 U.S.C. § 1119 to determine ownership of service marks and to cancel federal service mark registrations.

9. Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391 because a substantial portion of the events giving rise to the claims occurred in this District and the actions of NASKA, Inc. caused harm within this District.

## ALLEGATIONS COMMON TO ALL COUNTS

*The Origin of the North American Sport Karate Association*

10. The North American Sport Karate Association—referred to herein as Unincorporated NASKA—traces its origins back to the mid-1970s.

11. In 1977, Karate Illustrated magazine ("KI") began publishing ratings for karate tournaments and for the competitors at those tournaments to attempt to establish who the best martial artists were across various categories. KI continued this service until 1985, when it decided to shift its focus away from sport karate.

12. Following KI's decision to exit the ratings business in 1985, the promoters/principal owners of America's more prestigious tournaments— the US Open, the AKA Grand Nationals, the Battle of Atlanta, the New England Open, the Ocean State Grand Nationals, the Bluegrass Nationals, the US Capitol Classics and Diamond Nationals and a few others—decided to pick up the slack. The next year, in 1986, they formed the North American Sport Karate Association.

13. The name, "North American Sport Karate Association," derived from the fact that the association included not only tournaments that took place in the United States but also a tournament that took place in Canada run by Cezar Borkowski. For that reason, the founders of Unincorporated NASKA did

not believe "American Sport Karate Association" was a good fit and added the word "North" to connote that the association encompassed all of North America.

14. The primary goal in forming Unincorporated NASKA was to continue the ratings system started by KI, to refine that ratings system, and to implement a standard set of rules that could be used across all tournaments to make it easier to compare the results of one tournament against the results of another.

15. Unincorporated NASKA also began sanctioning tournaments. Participating in a NASKA-sanctioned tournament allowed a competitor to earn points towards his or her overall rating.

16. Sanctioning by NASKA was and is critical to a tournament's success, as the top martial artists generally will not participate in a sport karate tournament unless the result counts toward their rating.

17. NASKA eventually became one of the largest sport karate sanctioning and ratings organizations in the world.

***NASKA Governance***

18. As originally constituted, Unincorporated NASKA was governed by a Board of Directors. Each member of Unincorporated NASKA received one seat on the Board and one vote, and all significant decisions were made by a majority vote of the Board.

19. Unincorporated NASKA elected a President from among its membership to serve as moderator during Board meetings and to oversee the association's day-to-day operations.

20. Jim Lantrip was elected in 1986 to serve as the first President of Unincorporated NASKA.

21. Cesar Borkowski was elected in 1987 to succeed Mr. Lantrip as President.

22. Carnahan was elected in 1988 to succeed Mr. Borkowski as the third President and was re-elected continuously thereafter until 2026.

23. Carnahan's status as the third President of NASKA did not give him any greater ownership stake in the unincorporated association than any other Board member enjoyed.

24. Carnahan's status as the third President of NASKA did not give him any greater voting rights in the unincorporated association than any other Board member enjoyed.

***Commercialization and Use of "NASKA"***

25. Upon its formation in 1986, Unincorporated NASKA began commercializing the name "North American Sport Karate Association" and the "NASKA" acronym.

26. Beginning at least as early as 1987 if not earlier, the name "North American Sport Karate Association" and the "NASKA" acronym was used in

publications promoting the various tournaments that comprised the association. These were referred to as "NASKA Events."

27. Beginning at least as early as 1987 if not earlier, the ratings system used to rate competitors at these tournaments was referred to as "NASKA Ratings."

28. Beginning at least as early as 1987 if not earlier, at the end of each year, the highest-rated competitors would be crowned "NASKA Champions"

29. Along with the name "North American Sport Karate Association" and the "NASKA" acronym, Unincorporated NASKA used and commercialized the phrase "Uniting Sport Karate." This phrase appeared on t-shirts and on the cover of programs for NASKA events at least as early as 1987.

30. Unincorporated NASKA was the first to use name "North American Sport Karate Association," the "NASKA" acronym, and the phrase "Uniting Sport Karate" in commerce in connection with martial arts tournaments and has used these names and marks continuously ever since that time.

31. Because Unincorporated NASKA was the first to use name "North American Sport Karate Association," the "NASKA" acronym, and the phrase "Uniting Sport Karate" in commerce and has used these names and marks continuously ever since that time, Unincorporated NASKA owns the rights to this intellectual property.

32. In particular, the NASKA service mark belongs and has always belonged to Unincorporated NASKA. To the extent the individual members of Board of Directors of Unincorporated NASKA own the NASKA service mark, they own it for the benefit of Unincorporated NASKA and not for their individual benefit.

33. Over time, through its use and commercialization of the name "North American Sport Karate Association," the "NASKA" acronym, and the phrase "Uniting Sport Karate," Unincorporated NASKA generated significant goodwill.

34. The goodwill generated by the use and commercialization of name "North American Sport Karate Association," the "NASKA" acronym, and the phrase "Uniting Sport Karate," benefitted not only Unincorporated NASKA but also each of the tournaments that comprised NASKA.

35. Being able to promote a tournament as a NASKA Event meant that more and better competitors would attend the tournament.

36. The members of the Board of Directors of Unincorporated NASKA—by virtue of being Board members—were entitled to use "North American Sport Karate Association," "NASKA" and "Uniting Sport Karate" in connection with their tournaments.

37. Unincorporated NASKA, acting through its Board, also authorized certain third parties to use "North American Sport Karate Association,"

"NASKA" and "Uniting Sport Karate." These third parties included outside vendors, such as the vendors who compiled competitor ratings for NASKA events, vendors who handled advertising and social media for Unincorporated NASKA and NASKA-sanctioned tournaments, and non-member promoters of NASKA-sanctioned tournaments.

38. Unincorporated, acting through its Board, also authorized Carnahan, as President of NASKA, to use "North American Sport Karate Association," "NASKA" and "Uniting Sport Karate" to carry out tasks associated with his office, such as selecting and overseeing vendors commissioned to provide services to the association.

39. At all times, however, all such uses remained under the strict control of Unincorporated NASKA and the NASKA Board. Neither Carnahan nor anyone else was authorized to represent themselves as "NASKA" or as acting on behalf of NASKA except as the Board allowed.

40. On no occasion did the Board vote to transfer ownership of "North American Sport Karate Association," "NASKA" or "Uniting Sport Karate" to Carnahan or to any other individual Board member.

41. Members of the Board of Directors of Unincorporated NASKA, when and if they left the Board, lost any rights to "North American Sport Karate Association," "NASKA" and "Uniting Sport Karate" and were no longer entitled to use this intellectual property absent authorization from the NASKA Board.

***Carnahan's First Minnesota Corporation***

42. In March 1989, approximately three years after the North American Sport Karate Association was formed and began operating as an unincorporated association, Carnahan formed a Minnesota corporation called "North American Sport Karate Association, Inc." (File No. 6G-24). Carnahan did this for his own purposes and not at the direction or with the express authorization of the NASKA Board.

43. Carnahan did not, in March 1989 or at any time until March 2026, claim he had exclusive ownership rights to the name "North American Sport Karate Association" or the "NASKA" acronym.

44. Carnahan did not, in March 1989 or at any time thereafter have exclusive ownership rights to "North American Sport Karate Association" or "NASKA."

45. To the extent Carnahan had any ownership rights to "North American Sport Karate Association" or "NASKA," he owned "North American Sport Karate Association" and "NASKA," for the benefit of Unincorporated NASKA and not for his individual benefit, and his rights were co-extensive with the rights of other members of the NASKA Board.

46. This Minnesota corporation existed until 2013, when it was administratively dissolved. At no time was it a successor in interest to

Unincorporated NASKA in any respect. At no time did it have any ownership rights to "North American Sport Karate Association" or "NASKA."

***Carnahan's First Service Mark Registration***

47. In January 1990, Carnahan filed a service mark application to register the mark "NASKA UNITING SPORT KARATE" (and an accompanying design), which eventually matured into Registration No. 1633489. Caranahan did this for his own purposes and not at the direction or with the express authorization of the NASKA Board.

48. Carnahan did not, in January 1990 or at any time until March 2026, claim he had exclusive ownership rights to "North American Sport Karate Association," "NASKA" or "Uniting Sport Karate."

49. Carnahan did not, in January 1990 or at any time thereafter, have exclusive ownership rights to "North American Sport Karate Association," "NASKA" or "Uniting Sport Karate."

50. To the extent Carnahan had any ownership rights to "North American Sport Karate Association," "NASKA" or "Uniting Sport Karate," he owned "North American Sport Karate Association," "NASKA" and "Uniting Sport Karate" for the benefit of Unincorporated NASKA and not for his individual benefit, and his rights were co-extensive with the rights of other members of the NASKA Board.

51. The service mark registration issued on January 29, 1991, but the registration was cancelled on February 9, 2022, and is presently of no effect.

52. At no time while this service mark registration was effective did Carnahan disclose its existence to the NASKA Board.

### *Carnahan's Second Minnesota Corporation*

53. In January 2021, Carnahan formed a Minnesota corporation called "North American Sport Karate Association, Inc." (File No. 1213153300023) (referred to herein as "NASKA, Inc.," the Counterclaim Defendant). Carnahan did this for his own purposes and not at the direction or with the express authorization of the NASKA Board.

54. There was no vote on whether Carnahan should form NASKA, Inc.

55. NASKA, Inc. is not a successor in interest to Unincorporated NASKA in any respect.

56. NASKA, Inc. does not have any ownership rights to "North American Sport Karate Association" or "NASKA."

57. Carnahan did not, in January 2021 or at any time until March 2026, claim he had exclusive ownership rights to "North American Sport Karate Association" or "NASKA."

58. Carnahan did not, in January 2021 or at any time thereafter have exclusive ownership rights "North American Sport Karate Association" or "NASKA."

59. To the extent Carnahan had any ownership rights to "North American Sport Karate Association" or "NASKA," he owned "North American Sport Karate Association" and "NASKA" for the benefit of Unincorporated NASKA and not for his individual benefit, and his rights were co-extensive with the rights of other members of the NASKA Board.

***Carnahan's Second Service Mark Registration***

60. In June 2024, Carnahan filed a service mark application to register the mark NASKA, which eventually matured into Registration No. 7721429.

61. The June 2024 registration identified Carnahan's defunct first Minnesota corporation as the registrant when it issued on March 11, 2025.

62. Carnahan filed this service mark application this for his own purposes and not at the direction or with the express authorization of the NASKA Board. There was no vote on whether Carnahan would or should register this service mark, much less in the name of a corporation in which his fellow Board members had no ownership interest.

63. Carnahan did not, in June 2024 or at any time until March 2026, claim he had exclusive ownership rights to "North American Sport Karate Association" or "NASKA."

64. Carnahan did not, in June 2024 or at any time thereafter have exclusive ownership rights to "North American Sport Karate Association" or "NASKA."

65. NASKA, Inc. did not, in June 2024 or at any time thereafter have exclusive ownership rights to "North American Sport Karate Association" or "NASKA."

66. To the extent Carnahan had any ownership rights to "North American Sport Karate Association" or "NASKA," he owned "North American Sport Karate Association" and "NASKA," for the benefit of Unincorporated NASKA and not for his individual benefit, and his rights were co-extensive with the rights of other members of the NASKA Board.

67. Because NASKA, Inc. does not own rights to "NASKA," WTP has petitioned the United States Patent and Trademark Office to cancel Registration No. 7721429. The Petition for Cancellation remains pending.

***Formation of the Executive Committee and Conversion to an LLC***

68. In October 2025, at Carnahan's urging, the NASKA Unincorporated Association formed an Executive Committee to help streamline decision-making for the organization.

69. The Executive Committee was comprised of five members elected by the Board.

70. Until the Executive Committee was formed, decisions were made by a vote of the Board as a whole, which presented logistical and operational challenges.

71. On February 26, 2026, the NASKA Board as a whole voted unanimously to convert Unincorporated NASKA into WTP, a modern limited liability company organized under Florida law, and to assume Board member positions within WTP.

72. WTP became a legal entity on March 4, 2026.

73. On March 4, 2026, each Board member of Unincorporated NASKA became an equal member of WTP with one vote.

74. On March 4, 2026, by operation of law, all rights, title and interest in "North American Sport Karate Association," "NASKA" and "Uniting Sport Karate" possessed by Unincorporated NASKA and/or its Board members for the benefit of Unincorporated NASKA transferred to WTP as the successor-in-interest to Unincorporated NASKA.

75. Despite this conversion, the members of the WTP Board continued to be referred to in the industry as NASKA Board members, and tournaments sanctioned by the previously-unincorporated association continued to be referred to as NASKA Events and/or NASKA-sanctioned tournaments.

***Lyon's Duplicity***

76. Hunter B. Lyon ("Lyon") is the President and CEO of AKA Warrior Cup, LLC.

77. AKA Warrior Cup, LLC is the promoter of the AKA Warrior Cup sport karate tournament that takes place each January in Chicago, Illinois.

78. Lyon acquired his interest in AKA Warrior Cup, LLC from John Sharkey, now deceased.

79. Lyon also operates a web-based software management system known as MAT Action.

80. MAT Action contracts with sport karate tournaments to provide registration, product sales and scorekeeping services for those tournaments.

81. Historically, MAT Action also has managed the social media accounts for Unincorporated NASKA.

82. Although MAT Action identifies itself as a limited liability company in its customer contracts, MAT Action does not exist as a legal entity separate apart from Lyon.

83. Through his ownership of AKA Warrior Cup, LLC, Lyon was a member of the NASKA Board at the time of the vote to convert Unincorporated NASKA into WTP.

84. As a member of the NASKA Board, Lyon voted in favor of the conversion of Unincorporated NASKA into WTP.

85. Yet, behind the scenes, Lyon was attempting to use the conversion to discredit other Board members and advance his own interests.

86. Lyon spread false and defamatory rumors that the conversion was a mechanism to allow McCoy, the President of Pro Kick Productions, LLC (“Pro

Kick"), the promoter of the U.S. Open ISKA World Martial Arts Championships, to seize the NASKA business for himself and push Carnahan out.

87. On information and belief, these false rumors helped drive a wedge between McCoy and Carnahan even though they were longtime acquaintances and had worked together collaboratively since even before NASKA was formed in 1986.

88. On information and belief, Lyon's goal in spreading these rumors was to manipulate Carnahan, to cause Caranahan to trust him (Lyon) and distrust McCoy. Ultimately, it was Lyon—not McCoy—who desired to seize control of the NASKA business

***NASKA, Inc. is Discovered***

89. At around the same time Unincorporated NASKA became WTP, the NASKA Executive Committee discovered Carnahan had formed a second NASKA Inc.

90. Carnahan's purpose in forming a second NASKA, Inc. was unclear, as that entity did not appear to have conducted any official—or unofficial—NASKA business. Nevertheless, the NASKA Executive Committee was concerned about possible confusion between NASKA, Inc. and Unincorporated NASKA (which had become WTP).

91. The NASKA Executive Committee informed Carnahan that WTP considered his conduct to be a breach of fiduciary duty and an unauthorized use of the NASKA Marks, and asked Carnahan to dissolve NASKA, Inc.

92. Carnahan refused to dissolve NASKA, Inc. or to discuss the possible breach of his fiduciary duty to Unincorporated NASKA (WTP).

***Lyon's Failed Attempt to Replace Carnahan***

93. On March 2, 2026, Carnahan announced that he was stepping down as the President of NASKA (now WTP).

94. On information and belief, Lyon convinced Carnahan that he (Lyon) should be appointed as Carnahan's successor. This was completely contrary to how NASKA had operated in the past. All past presidents, including Carnahan, had been elected by a vote of the Board and not appointed.

95. On information and belief, Lyon urged Carnahan to forego an election because he (Lyon) feared he could not prevail in any fair election.

96. Consistent with Lyon's wishes, Carnahan announced he was appointing Lyon as president of NASKA.

97. The Executive Committee informed Carnahan that he could not simply appoint his successor and that, consistent with past practices, a new president would need to be elected by the Board.

98. Carnahan seemed to acknowledge he had overstepped his bounds.

99. Carnahan agreed to participate in an election to determine a new President of NASKA (now WTP).

100. Carnahan nominated Lyon for President of NASKA (now WTP).

101. McCoy also was nominated for President of NASKA (now WTP).

102. The election occurred on March 9, 2026.

103. Carnahan participated in the election, as he had agreed to do.

104. Lyon also reluctantly participated in the election.

105. Carnahan made calls to NASKA Board members to attempt to convince them to vote for Lyon.

106. Carnahan's phone calls were to no avail. McCoy received seven of twelve votes and was elected President over Lyon.

107. The Executive Committee notified both Carnahan and Lyon of the election results. They each questioned the legitimacy of the vote.

108. Carnahan wrote to the NASKA (WTP) Board on March 10, 2026, and asserted his right to cast a tie-breaking vote if the vote was evenly divided (which it was not).

109. In response to Carnahan's and Lyon's concerns, the Executive Committee prepared and produced a verified statement signed by all seven of the Board members who voted for McCoy.

110. The verified statement confirmed that McCoy had enough votes to become President of NASKA (WTP).

111. Notwithstanding this verified statement, which confirmed the legitimacy of the vote, Carnahan and Lyon remained dissatisfied that Lyon could not simply ascend to the NASKA presidency as Lyon planned and desired to do.

***Lyon Attempts to Rewrite History and Steal WTP Property***

112. Undaunted by the Board's rejection of his hand-picked successor, Carnahan caused his Minnesota corporation, NASKA, Inc., to form its own Board.

113. Immediately after being formed, the NASKA, Inc. Board, acting at Carnahan's direction, voted in Lyon as President of NASKA, Inc.

114. After being voted in President of NASKA, Inc., Lyon resigned his position as a NASKA (WTP) Board member and announced that NASKA, Inc. would offer the same services to the sport karate industry that were then being offered by NASKA (WTP) using the "NASKA" acronym.

115. Following this announcement, Lyon cut off WTP's access to a bank account used for NASKA operations.

116. At the time access was terminated, this bank account contained approximately $50,000 in tournament sanctioning fees and competitor membership fees collected for early 2026 events.

117. These funds represent revenues generated in the name of NASKA through the unincorporated association's longstanding operations and relationships with tournament promoters and competitors.

118. Since cutting off access to the account, Lyon and NASKA, Inc. have, on information and belief, continued to collect additional funds in the name of NASKA and have retained control over those funds without authorization

119. In addition to cutting of WTP's access to this bank account, Lyon seized control of WTP's website and social media account so that, on information and belief, he and NASKA, Inc. could control all messaging related to his new role as President of NASKA, Inc. and blur the distinction between NASKA, Inc. and Unincorporated NASKA (WTP).

120. As evidence of Lyon's intentions, he caused NASKA Inc.'s lawyers to send a threatening letter to promoters, administrators and others falsely suggesting NASKA, Inc. is the real NASKA, that Lyon was elected President of NASKA, and that NASKA, Inc. is the rightful owner of all NASKA assets.

121. Unbeknownst to NASKA Inc.'s lawyers, they were perpetuating a fraud. For over four decades, the "NASKA" acronym has been associated with Unincorporated NASKA. A NASKA Event and/or NASKA-sanctioned tournament has always meant a tournament sanctioned by Unincorporated NASKA. NASKA, Inc. was (and remains) nothing more than an upstart entity formed by Carnahan and conducting no business until March 2026 when Lyon used it to steal the NASKA business from WTP.

122. The actions of Lyon and NASKA, Inc. are causing upheaval in the sport karate world. Lyon and NASKA, Inc. are knowingly spreading

misinformation on the NASKA website and through the NASKA social media account, where it can be viewed by tournament competitors, promoters and administrators. Promoters and administrators are facing threats of legal action from NASKA, Inc.'s lawyers. Given Carnahan's longtime tenure as President of Unincorporated NASKA, his current association with and promotion of NASKA, Inc. has likely left many wondering what is going on.

## CAUSES OF ACTION

## COUNT I

## UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN PURSUANT TO 15 U.S.C. §1125(a)

123. Because Unincorporated NASKA was the first to use name "North American Sport Karate Association," the "NASKA" acronym, and the phrase "Uniting Sport Karate" in commerce and has used these names and marks continuously ever since that time, Unincorporated NASKA owns the rights to this intellectual property.

124. On March 4, 2026, by operation of law, all rights, title and interest in "North American Sport Karate Association," "NASKA" and "Uniting Sport Karate" possessed by Unincorporated NASKA and/or its Board members for the benefit of Unincorporated NASKA transferred to WTP as the successor-in-interest to Unincorporated NASKA.

125. For the avoidance of doubt, on March 26, 2026, with authorization from the NASKA Board, McCoy expressly assigned the rights to "North American Sport Karate Association" and "NASKA" to WTP.

126. WTP thus has prior rights in the NASKA name and service mark.

127. NASKA, Inc. has falsely represented that NASKA, Inc. is the legitimate organization operating under the NASKA name.

128. NASKA, Inc. participated in making these false representations verbally to tournament promoters, administrators and sponsors and in writing on social media and the NASKA website.

129. These false representations constitute deceptive acts in trade or commerce that are likely to mislead tournament promoters, administrators, sponsors, competitors and consumers regarding the origin and sponsorship of martial arts tournaments promoted under the name "North American Sport Karate Association" and the "NASKA" acronym.

130. As a direct result of these deceptive practices, WTP has suffered damages including lost sanctioning opportunities and harm to their reputation.

131. The conduct of NASKA, Inc. constitutes false designation of origin and unfair competition.

132. The conduct of NASKA, Inc. has caused irreparable injury to WTP and will continue to cause irreparable injury to WTP if NASKA, Inc. is not restrained by this Court from further violating WTP's service mark rights and

competing unfairly with WTP due to the confusion, mistake, or deception that will likely be generated among the trade and the public as a consequence of the above-described acts of infringement and unfair competition. WTP has no adequate remedy at law.

## COUNT II

## CANCELLATION OF SERVICE MARK REGISTRATION, PURSUANT TO 15 U.S.C. § 1119

133. Because Unincorporated NASKA was the first to use name "North American Sport Karate Association," the "NASKA" acronym, and the phrase "Uniting Sport Karate" in commerce and has used these names and marks continuously ever since that time, Unincorporated NASKA owns the rights to this intellectual property.

134. On March 4, 2026, by operation of law, all rights, title and interest in "North American Sport Karate Association," "NASKA" and "Uniting Sport Karate" possessed by Unincorporated NASKA and/or its Board members for the benefit of Unincorporated NASKA transferred to WTP as the successor-in-interest to Unincorporated NASKA.

135. For the avoidance of doubt, on March 26, 2026, with authorization from the NASKA Board, McCoy expressly assigned the rights to "North American Sport Karate Association" and "NASKA" to WTP.

136. WTP has prior rights in the NASKA name and service mark.

137. Unincorporated NASKA used the name and acronym in commerce since 1986, decades before Carnahan created NASKA, Inc. and before Carnahan applied for federal trademark registration of the NASKA service mark.

138. Registration of the NASKA service mark was obtained without the authorization or knowledge of WTP or its predecessor in interest, Unincorporated NASKA.

139. For the foregoing reasons, this registration should be cancelled.

**COUNT III**

**DECLARATORY JUDGMENT**

140. WTP incorporates by reference ¶¶ 122-127 as if fully set forth herein.

141. An actual, present, and justiciable controversy exists between WTP and NASKA, Inc. concerning the ownership and control of the NASKA service mark and the right to use the name "North American Sport Karate Association" and the "NASKA" acronym in commerce.

142. WTP contends is owns the NASKA service mark and has the exclusive right to use the name "North American Sport Karate Association" and the "NASKA" acronym in commerce. NASKA, Inc. contends that NASKA, Inc. owns the NASKA mark and has the exclusive right to use the name "North American Sport Karate Association" and the "NASKA" acronym in commerce.

143. This dispute is immediate and real and has resulted in NASKA, Inc. asserting control over the NASKA name, interfering with WTP's operations, and communicating conflicting claims of authority to third parties.

144. WTP seeks a declaration from this Court that:

a. WTP is the rightful owner of the NASKA service mark and associated goodwill;

b. WTP has the exclusive right to use the name "North American Sport Karate Association" and the "NASKA" acronym in commerce;

c. NASKA, Inc. has no valid ownership interest in the NASKA service mark; and

d. NASKA, Inc. has no right to use the name "North American Sport Karate Association" or the "NASKA" acronym in commerce.

**COUNT IV**

**CONVERSION**

145. WTP incorporates by reference ¶¶ 111-118 as if fully set forth herein.

146. WTP had an immediate right to possess and control bank accounts used to hold sanctioning fees, sponsorship revenues, and other funds associated with NASKA operations.

147. NASKA, Inc. exercised wrongful dominion and control over those accounts and funds in a manner inconsistent with WTP's rights. Among other

things, it prevented WTP from accessing the accounts and asserted unilateral control over the funds.

148. NASKA, Inc.'s control over the account included funds collected for specific tournaments and memberships.

149. These funds are identifiable property belonging to WTP.

150. NASKA, Inc. has retained and continues to retain such funds without authorization.

151. As a result of the conduct of NASKA, Inc. as described herein, WTP has been deprived of the use and benefit of its property and has suffered damages in an amount to be proven at trial.

**COUNT V**

**ACCOUNTING AND CONSTRUCTIVE TRUST**

152. WTP incorporates by reference ¶¶ 111-118 as if fully set forth herein.

153. NASKA, Inc. has received revenues and profits derived from its use of the NASKA mark and from its control over NASKA-related operations and accounts.

154. The amount of such revenues and profits is not presently known to WTP and cannot be ascertained without a full accounting because the relevant financial records are in the exclusive possession and control of NASKA, Inc.

155. The financial transactions at issue are numerous and complex, and WTP lacks an adequate remedy at law to determine the full extent of NASKA, Inc.'s unjust gains.

156. WTP is therefore entitled to a full accounting of all revenues, profits, and funds received by NASKA, Inc. in connection with its use of the NASKA service mark and its control over NASKA operations.

157. In addition, NASKA, Inc. holds funds and profits derived from their wrongful conduct, including sanctioning fees, sponsorship revenues, and other proceeds associated with the NASKA mark, which in equity and good conscience belong to WTP.

158. WTP is entitled to the imposition of a constructive trust over such funds and property to prevent NASKA, Inc. from unjustly retaining the benefits of its misconduct.

**COUNT VI**

**FRAUD ON THE UNITED STATES PATENT AND TRADEMARK OFFICE**

159. WTP incorporates by reference ¶¶ 12-17 & 25-40 as if fully set forth herein.

160. In the trademark application submitted to the United States Patent and Trademark Office, Carnahan, acting individually and on behalf of NASKA, Inc., declared under oath that NASKA, Inc. was the owner of the NASKA mark and that no other entity had the right to use the mark in commerce.

161. Carnahan made this declaration knowingly and with the intent that the United States Patent and Trademark Office rely upon it in issuing the service mark registration.

162. At the time this declaration was made, Carnahan knew the mark had been used continuously by the Unincorporated NASKA since 1986 and that Unincorporated NASKA had never transferred ownership of the mark to Carnahan or to NASKA, Inc.

163. The false statements made by Carnahan were material to the United States Patent and Trademark Office's decision to issue the trademark registration.

164. The United States Patent and Trademark Office did, in fact, rely on those statements in issuing the service mark registration.

165. WTP therefore seeks cancellation of the registration based on fraud.

**COUNT VII**

**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS**

166. WTP incorporates by reference ¶¶ 111-121 as if fully set forth herein.

167. WTP maintains ongoing business relationships with martial arts tournament promoters and sponsors.

168. NASKA, Inc. was aware of these relationships and intentionally and wrongfully interfered with them in the manner described herein.

169. In wrongfully interfering with these relationships, NASKA, Inc. acted without justification.

170. As a direct and proximate result of this wrongful interference, WTP suffered damages in an amount to be proven at trial.

**COUNT VIII**

**FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**

171. WTP incorporates by reference ¶¶ 111-131 as if fully set forth herein.

172. NASKA, Inc. engaged in deceptive and unfair practices in trade or commerce by falsely representing that NASKA, Inc. is the legitimate organization operating under the NASKA name.

173. The conduct of NASKA, Inc. has affected the public interest and has misled tournament promoters, competitors, and consumers within the martial arts community.

174. WTP has suffered damages as a direct and proximate result of the conduct of NASKA, Inc. in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, WTP respectfully requests that the Court enter a judgment as follows:

A. Declaring that WTP is the rightful owners of the NASKA name, service mark and associated goodwill;

B. Canceling the federal trademark registration obtained by NASKA, Inc. for the NASKA mark;

C. Permanently enjoining NASKA, Inc. from using the NASKA name or service mark in commerce;

D. Ordering NASKA, Inc. to immediately cease representing to tournament promoters, sponsors, competitors, and the public that they are authorized to operate or control NASKA;

E. Ordering NASKA, Inc. to restore WTP's access to all bank accounts and financial assets held in the name of NASKA or used for NASKA operations;

F. Ordering NASKA, Inc. to provide a full accounting of all revenues and profits derived from NASKA, Inc.'s use of the NASKA name and service mark;

G. Awarding WTP damages in an amount to be proven at trial;

H. Awarding WTP treble damages;

I. Awarding WTP its attorney's fees and costs as allowed by statute; and

J. Granting WTP such other and further relief as the Court deems just and proper.

**JURY DEMAND**

WTP demands trial by jury on all issues so triable.

Dated: June 18, 2026

Respectfully submitted,

*/s/ David L. Marcus*

David L. Marcus (*Pro Hac Vice)*
DLM LAW LLC
1100 Main Street, Suite 2730
Kansas City, Missouri 64105
Telephone: 816.285.3888
Fax: 816.222.0534
dmarcus@dlmlaw.com

and

Gilbert A. Schaffnit, FL #249769
719 NE 1st Street
Gainesville, Florida 32601
Telephone: 352.378.6593
gaslaw@gmail.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2026, a true and correct copy of the above and foregoing was filed with the Clerk of the Court by using the CM/ECF electronic filing system, which will send notification of such filing to all counsel of record.

*/s/ David L. Marcus*
*Attorney for Defendants*