UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

NORTH AMERICAN SPORT KARATE ASSOCIATION INC.;

Plaintiff,

v. Case No.: 6:26-cv-00752-GAP-RMN

WORLD TOUR PROMOTERS, LLC, et al;

Defendants,
_______________________________/

# ORDER

This matter came before the Court on Plaintiff North American Sport Karate Association, Inc.'s ("Plaintiff's") Motion to Dismiss Defendant World Tour Promoters, LLC's ("Defendant's") First Amended Counterclaims ("FAC"). Doc. 63. The Court has also considered Defendant's Response in Opposition. Doc. 69.

## I. Background

The dispute here arises amidst a fracture in the governance of the organization responsible for the "sanctioning, rating, and regulation of competitive sport karate events across the United States [and Canada]": the North American Sport Karate Association ("NASKA"). Doc. 1, ¶ 21; *see* Doc. 61, ¶ 13.

On April 7, 2026, Plaintiff filed its Complaint asserting claims that Defendants were engaged in ongoing trademark infringement under the Lanham Act and the

common law. Doc. 1, ¶¶ 60-70. Plaintiff, a Minnesota corporation, asserts that it has always owned the rights to the NASKA design logo and mark ("Mark") (collectively, the "Trademarks")—United States Registrations No. 1,633,489[1] and No. 7,721,429, respectively—through its Principal, Larry Carnahan ("Carnahan"), who acted as President of NASKA from 1989-2026. *See id.*, ¶¶ 14-39; Doc. 34 at ¶¶ 3-9; 97-98, 126-27.[2] Plaintiff alleges that the promoters involved at NASKA's nascence "were aware and consented to [] Carnahan incorporating the NASKA business" in 1989 (and again, in 2021) and "allowed their joint ownership rights in the NASKA marks to pass to [his] corporation." Doc. 34, ¶¶ 57, 123-24.

Defendant tells a different story in its FAC. By its telling, the rights to the Trademarks have until recently been owned by the NASKA unincorporated association ("U-NASKA"), which was founded in 1986 after all of the "promoters/principal owners of America's most prestigious tournaments" resolved to "continue the ratings systems started by [Karate Illustrated in 1977], to refine that ratings system, and to implement a standard set of rules that could be used across all tournaments[.]" Doc. 61, ¶¶ 10-14; *see also* Doc. 34, ¶¶ 38-40.

---

[1] Defendant's First Amended Counterclaims ("FAC") allege that the design logo with Registration No. 1,633,489 "was cancelled on February 9, 2022, and is presently of no effect" and that "[a]t no time while this service mark registration was effective did Carnahan disclose its existence to the NASKA Board." Doc. 61, ¶¶ 51-52.

[2] On May 15, 2026, Plaintiff filed an Amended Complaint in Response to Defendants' Motion to Dismiss. Doc. 34; *see* Doc. 32.

Defendant alleges that U-NASKA was originally governed by a board of directors ("Board") whereby each member had one seat and one vote, with all decisions of the Board requiring a majority vote. Doc. 61, ¶ 18. Several presidents have been elected to lead U-NASKA's "Board meetings and to oversee…day-to-day operations[,]" including Carnahan from 1988-2026; but that title did not confer "any greater ownership stake" or "any greater voting rights[.]" *Id.*, ¶¶ 19-24.

Plaintiff rejects Defendant's characterization of U-NASKA as an organized association, but it does not dispute that early NASKA participants may have "operated informally…as a promoter counsel or advisory body that collaborated on sanctioning, ratings, regulation, divisions, rules, and event participation"—or that Plaintiff's predecessor-in-interest was not formed until three years after "the date the promoter group met at the U.S. Open in 1986[.]"[3] Doc. 34, ¶¶ 44, 53, 40-54; *see* Doc. 63 at 3-4, 8.

According to the FAC, Carnahan formed Plaintiff (a new, but practically identical corporation to the 1989 corporation that was administratively dissolved in 2013) in January 2021 but did so "for his own purposes and not at the direction or

[3] Plaintiff even states in its Amended Complaint that Carnahan "plotted the course of the 1989 Corporation based on the overall wishes of the promoters, and in that sense considered the 1989 Corporation's business to be a 'democracy.' " Doc. 34, ¶ 79. Defendant notes, however, that the 1989 Corporation was administratively dissolved in 2013 and maintains that "[a]t no time was it a successor in interest to [U-NASKA] in any respect." Doc. 61, ¶ 46.

with the express authorization of [U-NASKA].” Doc. 61, ¶ 53. Defendant’s allegations are clear that there was no vote by the Board to form Plaintiff and that Plaintiff is not a successor-in-interest to U-NASKA “in any respect”—nor does it have any ownership rights in the Trademarks. *Id.*, ¶¶ 53-59.

In June 2024, the FAC alleges that Carnahan filed a service mark application to register the Mark—the textual NASKA name—but did so under the now-defunct first iteration of Plaintiff. *Id.*, ¶¶ 60-61. The Mark was issued registration No. 7,721,429 on March 11, 2025. *Id.*, ¶ 61. Defendant again insists that U-NASKA never directed or authorized this action and no vote was ever conducted. *Id.*, ¶¶ 62-66. Defendant has a petition for cancellation of Plaintiff’s registration pending with the United States Patent and Trade Office (“USPTO”). *Id.*, ¶ 67.

After decades of making decisions “by vote of the Board as a whole,” in October 2025 (at Carnahan’s urging), U-NASKA formed a five-member Executive Committee “to help streamline decision-making for the organization.” *Id.*, ¶¶ 68-70. On February 26, 2026, the NASKA Board “as a whole voted unanimously to convert [U-NASKA] into [Defendant], a modern limited liability company organized under Florida law…[which] became a legal entity on March 4, 2026.” *Id.*, ¶¶ 71-72. Accordingly, “each Board member of [U-NASKA] became an equal member of [Defendant] with one vote” and “by operation of law all rights title and interest in [the Trademarks] possessed by [U-NASKA] and/or its Board

members…transferred to [Defendant] as the successor-in-interest to [U-NASKA]." *Id.*, ¶¶ 73-74. Despite this conversion, the industry still refers to Defendant as the "NASKA Board" and sanctioned events as "NASKA Events[.]" *Id.*, ¶ 75.

According to the FAC, the present fracture within NASKA arose after Board member Hunter Lyon ("Lyon") resolved to use these changes "to discredit other Board members and advance his own interests" by speculating that the conversion from U-NASKA to an LLC had been undertaken so that Defendant Mike McCoy ("McCoy") could "seize the NASKA business for himself and push Carnahan out." *Id.*, ¶ 86. The FAC alleges that despite voting in favor of the conversion, Lyon "spread [these] false and defamatory rumors…to manipulate Carnahan to trust him (Lyon) and distrust McCoy[,]" thereby driving a wedge between McCoy and Carnahan (who "had worked together collaboratively since even before NASKA was formed in 1986"). *Id.*, ¶¶ 84, 87-88.

Around the same time as the conversion, the Executive Committee discovered the existence of Plaintiff and informed Carnahan that Defendant (U-NASKA's successor-in-interest) "considered his conduct to be a breach of fiduciary duty and an unauthorized use of the [Trademarks], and asked [him] to dissolve Plaintiff." *Id.*, ¶ 89-91. Carnahan refused to discuss these accusations and announced his intention to step down as NASKA President on March 2, 2026, and appoint Lyon as his replacement. *Id.*, ¶¶ 92-96. However, the Executive Committee

balked at this suggestion and told Carnahan that the organization's past practices require new presidents to be elected by the Board. *Id.*, ¶ 97.

After agreeing to participate in the March 9, 2026, election, Carnahan nominated Lyon for President to run against McCoy. *Id.*, ¶¶ 98-101. McCoy prevailed over Lyon by 7 votes to 5 votes. *Id.*, ¶¶ 101-06. After Carnahan and Lyon questioned the legitimacy of the vote, the Executive Committee "produced a verified statement signed by all seven of the Board members who voted for McCoy" which confirmed he had won the majority required "to become President of NASKA." *Id.*, ¶¶ 107-10.

Dissatisfied, Carnahan and Lyon allegedly then turned to Plaintiff, where they hastily formed a new corporate board of directors and voted Lyon in as President of Plaintiff. *Id.*, ¶¶ 111-13. Subsequently, Lyon resigned his position as a Board member with Defendant and began directing Plaintiff, as its President, to "offer the same services to the sport karate industry that were then being offered by [Defendant] using the 'NASKA' acronym." *Id.*, ¶ 114. Plaintiff, under the direction of Carnahan and Lyon, continues to hold itself out as NASKA by collecting fees and dues and seizing control of and operating NASKA's bank account, website, and social media accounts.[4] *Id.*, ¶¶ 118-22. These actions "are causing upheaval in the

[4] Lyon allegedly seized control of NASKA's operational bank account which held "approximately $50,000 in tournament sanctioning fees and competitor membership fees collected for early 2026 events." Doc. 61, ¶¶ 115-16.

sport karate world" with misinformation spreading and "[p]romoters and administrators…facing threats of legal action from [Plaintiff's] lawyers."[5] *Id.*, ¶ 122.

On June 5, 2026, Plaintiff filed its first motion to dismiss Defendant's Counterclaim. Doc. 50; *see also* Doc. 46. But on June 18, 2026, Defendant filed its FAC, rendering Plaintiff's first motion to dismiss Moot. Doc. 61; Doc. 62; *see Fritz v. Standard Sec. Life Ins. Co. of New York*, 676 F.2d 1356, 1358 (11th Cir. 1982) ("Under the Federal Rules, an amended [counterclaim] supersedes the original [counterclaim].").[6] Defendant then filed the instant renewed Motion to Dismiss and Plaintiff responded, leaving the matter ripe for adjudication. *See* Doc. 63; Doc. 69.

## II. Legal Standard

In ruling on a motion to dismiss, the Court must view the complaint in the light most favorable to the plaintiff, *see, e.g., Jackson v. Okaloosa Cnty.*, 21 F.3d 1531, 1534 (11th Cir. 1994), and must limit its consideration to the pleadings and any exhibits attached thereto. *See* Fed. R. Civ. P. 10(c); *see also GSW, Inc. v. Long Cnty.*, 999 F.2d 1508, 1510 (11th Cir. 1993). The Court will liberally construe the complaint's allegations in the Plaintiff's favor. *See Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969).

---

[5] In recognition of the "upheaval" that has been occasioned by this dispute, the Court set this case on an expedited schedule. *See* Doc. 27 at 2; Doc. 41.

[6] "A motion to dismiss a counterclaim under Fed. R. Civ. P. 12(b)(6) is evaluated in the same manner as a motion to dismiss a complaint." *Whitney Information Network, Inc. v. Gagnon*, 353 F.Supp.2d 1208, 1210 (M.D. Fla. 2005); *see also Zurich Am. Ins. Co. v. Tavistock Rests. Grp., LLC*, 2022 WL 16985151 (11th Cir. 2022).

However, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In reviewing a complaint on a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), "courts must be mindful that the Federal Rules require only that the complaint contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 880 (11th Cir. 2003) (citing Fed. R. Civ. P. 8(a)). This is a liberal pleading requirement, one that does not require a plaintiff to plead with particularity every element of a cause of action. *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001). However, a plaintiff's obligation to provide the grounds for his or her entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007). The complaint's factual allegations "must be enough to raise a right to relief above the speculative level," *id.* at 555, and cross "the line from conceivable to plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009).

## III. Analysis

Plaintiff's Motion to Dismiss Defendant's First Amended Counterclaims ("FAC") amounts to a premature attempt to litigate the factual disputes that underlie this case—and which will likely require consideration and resolution by a

jury. The Motion's primary contention is that the FAC fails to allege Defendant's prior rights in the Trademarks and, accordingly, that it cannot state claims for trademark infringement or the related state counts. Because that argument and its independent grounds for dismissing Defendant's counterclaims are unavailing, Plaintiff's Motion is due to be denied.

**A. The FAC Alleges Prior Rights**

As a threshold matter, Plaintiff undercuts its entire argument by, at the outset, succinctly describing Defendant's theory of ownership: the FAC alleges that (1) a group of promoters/principal owners formed U-NASKA in 1986 and began using the Trademarks, thereby vesting the initial rights in U-NASKA; (2) U-NASKA owned those rights continuously from 1986-2026; (3) on February 26, 2026, U-NASKA's members unanimously voted to convert the organization into Defendant, an LLC; and (4) on March 4, 2026, by operation of law, all rights in the Trademarks transferred to Defendant. *See* Doc. 63 at 6-7; Doc. 61, ¶¶ 10-14, 25-41, 71-74; *see also Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 419 (2015) ("The party who first uses a mark in commerce is said to have priority over other users.").

Taking each of Plaintiff's arguments in turn, it is clear that the foregoing allegations are sufficient to plausibly allege that Defendant possesses prior rights to the Trademarks. *See generally* Doc. 61; *Hana Bank*, 574 U.S. at 419.

### 1. Unincorporated Associations May Possess Trademark Rights

Plaintiff argues that U-NASKA could not have owned trademark rights because under Florida law, unincorporated associations do not exist as legal entities and cannot own property. *See* Doc. 63 at 9-13 (citing *Asociacion De Perjudicados Por Inversiones Efectuadas En U.S.A. v. Citibank, F.S.B.*, 770 So. 2d 1267, 1269 n.3 (Fla. 3d DCA 2000) ("An unincorporated…association has no legal existence.")). But as Defendant recognizes, in addition to persuasive out-of-circuit jurisprudence recognizing that unincorporated associations can hold trademark rights, the Federal Rules of Civil Procedure *explicitly* provided U-NASKA with the rights to enforce its alleged prior use under the Lanham Act. Fed. R. Civ. P. 17(b)(3)(A) ("a partnership or other unincorporated association with no such capacity under that state's law may sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws"); *see Southern California Darts Ass'n v. Zaffina*, 762 F.3d 921, 930 (9th Cir. 2014) ("[U]nincorporated associations have the capacity to own trademarks.").

Plaintiff's other cited cases involve distinguishable parties or arise under distinguishable (often state law) claims, and do not suggest that U-NASKA was incapable of owning the federal trademark rights at issue in this matter. *See* Doc. 63 at 10-12. For instance, in *Citibank*—a securities fraud case brought by a group of foreign investors—the court recognized that, "[a]t common law, unincorporated

associations were treated as partnerships." 770 So.2d at 1268. It concluded, however, that partnership law could not be applied to the plaintiffs' unincorporated association in that case because they were not-for-profit and it found that "[t]he legislature clearly intended [partnership law] to apply only to for-profit organizations." *Id.* at 1269. It ultimately determined that the plaintiff unincorporated association lacked standing to advance its securities fraud claims because it was a not-for-profit unincorporated association. *See id.*

*Citibank* looks nothing like the instant matter. Moreover, even if somehow U-NASKA could not have owned the Trademarks as an unincorporated association under Florida law, it is likely that it would have been considered a partnership for those purposes anyway, given its for-profit nature.[7] *See id.*; *Guyton v. Howard*, 525 So.2d 948, 956 (Fla. Dist. Ct. App. 1988) ("We shall attempt to lay to rest some of the evident confusion regarding unincorporated associations whose functions are fraternal or social as opposed to business or profit. The latter are governed by partnership law. The former are a legal enigma in Florida."). And Plaintiff (of course) does not contest that a partnership can own property.[8] *See generally* Doc. 63;

[7] No party has ever alleged that any iteration of NASKA is a not-for-profit organization and, appearing to clearly be a for-profit organization, the Court assumes that it is. *See, e.g.*, Doc. 34, ¶¶ 70 (Plaintiff's Amended Complaint recognizing the for-profit nature of the NASKA organization and its affiliates, who "provid[e] ratings and membership services in exchange for collecting and retaining membership income and ratings fees"), 124 (Plaintiff referring to "…the NASKA **business** and marks") (emphasis added).

*see also, e.g.*, Fla. Stat. § 620.1105.

Plaintiff also argues that if unincorporated associations can own property, it is only insofar as such property is owned by its members individually and jointly in equal shares. *See* Doc. 63 at 11 (citing *Citibank*, 770 So.2d at 1269, n.3). These cases and treatises stand for the proposition that "members had the right to manage, control, and dispose of association property only at their joint pleasure, requiring unanimous action." *Id.* at 12 (citing 3A Fla. Jur. 2d Associations and Clubs § 10; 6 Am. Jur. 2d Associations and Clubs §18).

But Plaintiff does not dispute that Defendant alleges that the U-NASKA Board voted unanimously to convert to an LLC and thereby, as noted above, transfer its property and rights in the Trademarks to Defendant, its successor-in-interest. *See supra* at 11, n.7; *see generally* Doc. 63; *see also, e.g.*, *SB Initiative, Inc. v. Cheekwood Botanical Garden and Museum of Art*, No. 3:24-cv-00821, 2024 WL 4279510, *6 (M.D. Tenn. Sept. 24, 2024) ("Unincorporated associations can own trademarks…[a]nd the incorporation of a voluntary association, **if the act of the association and not the unauthorized step of some of its members, merges the association in the corporation, and its property becomes the property of the**

[8] Moreover, a partnership, following the unanimous decision of its partners, is plainly entitled by statute to convert to a different kind of business organization (ie. a limited liability company) with the new entity automatically—or, "by operation of law"—receiving transfer of the original partnership's property, including trademark rights. *See* Fla. Stat. §§ 620.2102, 620.2105, and 495.011(8); *see also* Doc. 69 at 21.

**corporation**.") (quoting *Third Education Group, Inc. v. Phelps*, 675 F.Supp.2d 916, 921 (E.D. Wis. 2009) and 8 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations*, § 4004) (internal quotations omitted). Therefore, whether it was an unincorporated for-profit association or a partnership, Defendant has alleged that the requisite unanimous approval was attained to transfer NASKA's property, rights, and governing structure into an LLC (Defendant). *See id.*; Fla. Stat. §§ 2102 and 2105.

The FAC sufficiently and plausibly alleges that U-NASKA, as the first user, owned the initial rights in the Trademarks.

**2. The FAC Establishes a Plausible Chain of Title**

Having established that U-NASKA could have enforced its alleged prior rights in the Trademarks in its own name, it is virtually uncontested that it was the first user of the Trademarks here. *See* Doc. 34, ¶ 32-54; *see generally* Doc. 63. At worst, the FAC unquestionably contains credible allegations that the Trademarks were first used in 1986 (with which Plaintiff agrees) and that the first user of the Trademarks was U-NASKA. Doc. 61, ¶¶ 25-41. Even Plaintiff admits that the Trademarks' first use dates to 1986 and that the "early participants [may have] operated informally…as a promoter council or advisory body that collaborated on sanctioning, ratings, regulation, divisions, rules, and event participation"—which sounds a lot like an unincorporated association. *See* Doc. 34, ¶¶ 3, 44.

This glaring fact notwithstanding, Plaintiff argues that the FAC cannot establish a chain of title for two reasons: 1) Defendant has failed to name every single member of U-NASKA and how each membership has evolved, including by tracking the chain of title from each existing member all the way to the founding members; and 2) the FAC fails to allege how rights in the Trademarks transferred from U-NASKA to Defendant. Doc. 63 at 8-13. Neither argument has merit.

First, Defendant cites to no legal authority whatsoever in support of its assertion that Defendant must track every member and former member's ownership interest in U-NASKA from its founding to its conversion into an LLC. *See id.* at 8, 13. And the Court is convinced by (non-binding) authority from the Trademark Trial and Appeal Board ("T.T.A.B.") that there is no such requirement. *See Klique Car Club Inc. v. Klique E.L.A. Car Club*, CANCELLATION 9207447, 2023 WL 3168426 (Trademark Tr. & App. Bd. Apr. 12, 2023).

*Klique Car Club* involved a similar long-running unincorporated association (of car enthusiasts) which ultimately incorporated (and also splintered). *Id.* at *9-*13. The T.T.A.B. found that "given the informal nature of the club when it was founded [decades ago] and its existence thereafter as an unincorporated association with a fluid membership, the absence of formal documentation of the club's formation and subsequent operation is unremarkable." *Id.* at *17. Indeed, "[t]he absence of a list of all members of the club…is immaterial because the frequently

changing composition of the club's membership…belies [the] suggestion that all members of the original group…had to be in agreement [decades] later regarding use or registration of the [Trademarks.]" *Id.* at *17.

Here, too, it is unremarkable that Defendant has not alleged a chain of title from every single member or former member of U-NASKA since 1986—most importantly because, as the FAC alleges, to any extent the individual members owned the Trademarks they did so "for the benefit of [U-NASKA]" and "when and if they left the Board, [they] lost any rights to [the Trademarks]." *See id.*; Doc. 61, ¶¶ 32, 41.

Second, the FAC plausibly alleges that priority rights in the Trademarks transferred from U-NASKA to Defendant. As the Court already discussed, if Defendant remained an unincorporated association under Florida law through 2026, each member unanimously voted to convert to an LLC, thereby automatically transferring any individual ownership rights in the Trademarks to the Defendant LLC. *See* Doc. 61, ¶¶ 68-75; *SB Initiative, Inc.*, 2024 WL 4279510 at *6. And if Florida partnership law were applied to U-NASKA, its transfer of ownership rights to Defendant was authorized by statute. *See* Fla. Stat. §§ 2102 and 2105; *Guyton*, 525 So.2d at 956.

Therefore, the FAC has plausibly alleged that Defendant holds "valid and protectable" rights to the Trademarks via U-NASKA's conversion into Defendant.

As a result of the Court's findings, Counts I, II, III, IV, V, and VIII state a claim for relief. *See* Doc. 63 at 20-22; *Twombly*, 550 U.S. at 554-55; *Iqbal*, 556 U.S. at 680.

**B. The FAC Complies with Rule 9(b)**

Plaintiff argues independently that Defendant's Count VI counterclaim for fraud on the USPTO does not satisfy the heightened pleading requirements of Rule 9(b). *See* Doc. 63 at 17; Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). "Claims of fraud must identify the who, what, when, where, and how of the fraud alleged." *Al Rushaid Petroleum Inv. Co. v. Siemens Energy Inc.*, 159 F.4th 887, 896 (11th Cir. 2025) (internal quotations and citations omitted).[9]

Defendant's FAC easily satisfies Rule 9(b)'s pleading requirements. *See* Doc. 61, ¶¶ 58, 60-61, 159-165. First, it plainly alleges that "Carnahan, acting individually and on behalf of [Plaintiff]…declared under oath that [Plaintiff] was the owner of the NASKA mark and that no other entity had the right to use the mark in commerce" despite knowing that the Mark had been continuously used by U-NASKA since 1986. *Id.*, ¶¶ 160-62. Second, the FAC pleads that the false statements

---

[9] *See also Crawford's Auto Ctr., Inc. v. State Farm Mut. Automobile Ins. Co.*, 945 F.3d 1150, 1159 (11th Cir. 2019) (affirming this Court's orders in another case and recognizing that "[a] party satisfies Rule 9(b) if the complaint includes (1) precisely what statements were made in what documents or what omissions were made; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) each statement; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendants obtained as a consequence of the fraud.") (internal quotations omitted).

were made "[i]n the trademark application" submitted to the USPTO in June 2024.[10] *Id.*, ¶¶ 60, 160. Finally, the FAC explicitly alleges that these statements were material to the USPTO's decision to issue the trademarks and that, as a result of Plaintiff's false statements, it was issued the service mark registration. *Id.*, ¶¶ 163-64.

Therefore, Count VI of the FAC states a claim for fraud on the USPTO.[11] *See, e.g.*, *Unisource Discovery, Inc. v. Unisource Discovery, LLC*, No. 20-23276-CIV, 2022 WL 773280, *4 (S.D. Fla. Jan. 13, 2022), *report and recommendation adopted*, No. 1:20-CV-23276, 2022 WL 767265 (S.D. Fla. Mar. 14, 2022).

### C. The FAC States a Claim for Tortious Interference

Plaintiff also contends that Defendant's Count VII counterclaim for tortious interference fails because it "fails to identify a single specific business relationship with which [it] interfered." Doc. 63 at 21. But as Defendant recognizes, the FAC identifies the "ongoing business relationships [Defendant has] with martial arts tournament promotors and sponsors" and even specifically cites to a letter sent by Plaintiff to those precise "promoters, administrators, and individuals acting on

[10] Though Count VI does not explicitly reference paragraph 60, it is obvious that the mark registration central to this case was the "trademark application" referred to in that paragraph. *See* Doc. 61, ¶¶ 160-61. Indeed, the only other registered service mark discussed in the FAC—the 1991 registration for the logo ending in -489—"was cancelled on February 9, 2022, and is presently of no effect." *Id.*, ¶ 51. Thus, the only mark for which Defendant could "seek cancellation of the registration based on fraud" in Count VI is the June 2024 registration." *See id.*, ¶¶ 60-67, 165.

[11] Plaintiff demands sufficient detail to *prove* Defendant's counterclaim for fraud on the USPTO, but at this stage—despite the heightened requirements of Rule 9(b)—Defendant need only *plead* its counterclaims. *See* Doc. 63 at 19; *Iqbal*, 556 U.S. at 680.

behalf of or in connection with NASKA." Doc. 69 at 18; Doc. 61, ¶ 167; Doc. 34-18 at 2. Moreover, Defendant asserts that it cannot know all of the precise identities of the recipients of the letter until discovery yields that information, which Plaintiff presently possesses. Doc. 69 at 18.

While allegations of interference with a business's relationship to the community at large do not state a claim, "[i]n Florida, a plaintiff may properly bring a cause of action alleging tortious interference with present or prospective customers[.]" *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla. 1994). Particularly in the context of this case, where Plaintiff and Defendant dispute ownership of the same business (with which both are intimately familiar), Plaintiff's complaints regarding specificity ring especially hollow. The "general rule" that tortious interference claims allege "the existence of a business relationship, not necessarily evidenced by an enforceable contract" is satisfied here. *See id.*; *Maxi-Taxi of Fla., Inc. v. Lee Cnty. Port Auth.*, No. 2:07-CV-82FTM34SPC, 2008 WL 1925088, *12 (M.D. Fla. Apr. 29, 2008), *aff'd*, 301 F. App'x 881 (11th Cir. 2008) (unpublished).

Therefore, Count VII of the FAC states a claim for tortious interference.

**D. The FAC is Not a Shotgun Pleading**

Finally, Plaintiff complains again that, despite amending its counterclaims, Defendant still runs afoul of shotgun pleading prohibitions. Doc. 63 at 23-24. These complaints are perfunctory, however, and do not militate in favor of dismissal.

Rule 8(a)(2) requires only that a pleading "must contain a short and plain statement of the claim showing that the pleaders is entitled to relief." And the Eleventh Circuit's shotgun pleading jurisprudence exists to ensure "defendants [have] adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015). Plaintiff complains that specific paragraph references are missing from Defendant's counts but in the same breath cites to the precise "missing" paragraphs, betraying its clear comprehension of Defendant's counterclaims. *See id.*; Doc. 63 at 24 (noting that the financial counts "omit the chain-of-title allegations (*id.* ¶¶ 10-74) that are essential to establish [Defendant's] right to possess and control those accounts" while also specifically identifying those "omitted" allegations).

Defendant's FAC may not be an exemplar of detailed, comprehensive pleading, but it is more than sufficient to give Plaintiff "adequate notice of the claims against [it] and the grounds upon which each claim rests."[12] *See Weiland*, 792 F.3d at 1320.

## IV. Conclusion

Accordingly, it is **ORDERED** that Plaintiff's Motion to Dismiss Defendant's Counterclaim (Doc. 63) is hereby **DENIED**.

[12] This is particularly true in the context of this expedited litigation. *See supra* at note 5.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on July 22, 2026.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party