**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**NORTH AMERICAN SPORT KARATE ASSOCIATION, INC.,**
a Minnesota corporation,

Plaintiff/
Counterclaim Defendant,

v. Case No. 6:26-cv-00752-GAP-RMN

**WORLD TOUR PROMOTERS, LLC,**
et al.,

Defendants/
Counterclaimant.
_________________________________/

**DEFENDANT'S/COUNTERCLAIMANT'S' MOTION FOR SUMMARY JUDGMENT**

David L. Marcus (*Pro Hac Vice)*
DLM LAW LLC
1100 Main Street, Suite 2730
Kansas City, Missouri 64105
Telephone: 816.285.3888
Fax: 816.222.0534
dmarcus@dlmlaw.com

*Attorney for Defendants*

Gilbert A. Schaffnit, FL #249769
719 NE 1st Street
Gainesville, Florida 32601
Telephone: 352.378.6593
gaslaw@gmail.com

*Attorney for Defendants*

## TABLE OF CONTENTS


Table of Authorities ..... iv

I. Statement of Uncontroverted Facts ..... 1

II. Argument ..... 10

A. Legal Standards ..... 10

B. WTP is Entitled to Judgment as a Matter of Law on Each and Every Claim in the First Amended Complaint Because the Uncontroverted Facts Demonstrate that Plaintiff NASKA, Inc. Does Not Own the "NASKA" Service Mark ..... 11

1. Plaintiff NASKA, Inc. is Not an Original Owner of the "NASKA" Service Mark ..... 13

2. Larry Carnahan is Not an Original Owner of the "NASKA" Service Mark ..... 14

3. The "NASKA" Service Mark was Never Assigned to Plaintiff NASKA, Inc. or to Larry Carnahan ..... 15

C. WTP is Entitled to Judgment as a Matter of Law on Counts I and II of the First Amended Counterclaims ..... 18

1. WTP is Entitled to Judgment as a Matter of Law on its Counterclaim for False Designation of Origin ..... 18

a. WTP is the Prior Owner of the "NASKA" Service Mark ..... 19

b. Plaintiff NASKA, Inc. is Using the Same Mark as WTP and Creating a Likelihood of Confusion ..... 20

2. WTP is Entitled to Judgment as a Matter of Law on its Counterclaim for Cancellation of Plaintiff's Service Mark Registration ..... 21

a. WTP Has Standing ..... 22

b. Use of the "NASKA" Service Mark by Plaintiff NASKA, Inc. is Likely to Cause Confusion ..... 23

Conclusion ..... 23

Certificate of Service ..... 24

# TABLE OF AUTHORITIES

Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 11

*Bible Way Church of Our Lord Jesus Christ World Wide, Inc. v. Showell*,
260 F.R.D. 1 (D.D.C. 2009) .......... 13, 14, 19

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 10

*Conagra, Inc. v. Singleton*,
743 F.2d 1508 (11th Cir. 1984) .......... 18, 19, 20

*Custom Vehicles, Inc. v. Forest River, Inc.*,
476 F.3d 481 (7th Cir. 2007) .......... 12

*Fitz v. Nunez*,
Civil Action No. 3:23-cv-2298-B
2025 WL 2856306 (N.D. Tex. Oct. 8, 2025) .......... 16

*Fitzpatrick v. City of Atlanta*,
2 F.3d 1112 (11th Cir. 1993) .......... 10

*Hana Fin., Inc. v. Hana Bank*,
574 U.S. 418 (2015) .......... 13, 19

*Jordan International, Inc. v. United Industries Sales Organization, Inc.*,
699 F.Supp. 268 (S.D. Fla. 1988) .......... 12

*Murray v. Sevier*,
156 F.R.D. 235 (D. Kan. 1994) .......... 15

*Nu Pagamentos S.A. – Instituicao de Pagamento v. Hudson*,
Civil Action No. 2:21-CV-69-RWS
2023 WL 2377641 (N.D. Ga. Feb. 22, 2023) .......... 21, 23

*Pan Ocean Co., Ltd. v. World Fuel Services (Singapore) Pte. Ltd.*,
Case No. 23-20014-CIV-ALTONAGA/Damian
2024 WL 216279 (S.D. Fla. Jan. 19, 2024) ........ 10

*Pinnacle Advert. Grp, Inc. v. Pinnacle Advert. and Mark. Grp, LLC*,
7 F4th 989 (11th Cir. 2021) ........ 21, 22

*Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.*,
80 F.4th 607 (5th Cir. 2023) ........ 16

*Ritchie v. Simpson*,
170 F.3d 1092 (Fed. Cir. 1999) ........ 22

*Royal Palm Properties, LLC v. Pink Palm Properties, LLC*,
950 F.3d 776 (11th Cir. 2020) ........ 22

*SB Initiative, Inc. v. Cheekwood Botanical Garden and Museum of Art*,
No. 3:24-cv-00821
2024 WL 4279510 (M.D. Tenn. Sept. 24, 2024) ........ 13, 19

*Sesderma, S.L. v. Mediderm Labs*,
Case No. 1:19-cv-22333-GAYES
2020 WL 4905403 (S.D. Fla. Feb. 21, 2020) ........ 18

*Southern California Darts Ass'n v. Zaffina*,
762 F.3d 921 (9th Cir. 2014) ........ 13, 19

*Third Education Group, Inc. v. Phelps*,
675 F.Supp.2d 916 (E.D. Wis. 2009) ........ 14, 19

*Thoroughbred Legends, LLC v. The Walt Disney Co.*,
Civil No. 1:07-CV-1275-BBM
2008 WL 616253 (N.D. Ga. Feb. 12, 2008) ........ 12

*TMT North America, Inc. v. Magic Touch*,
124 F.3d 876 (7th Cir. 1997) ........ 16

*White v. Toscano, Inc.*,
Case No. 8:04-cv-2438-T-26MSS
2005 WL 8160219 (M.D. Fla. Oct. 11, 2005) ........ 12

*Z Productions, Inc. v. SNR Productions, Inc.*,
No. 8:10-CV-966-T-23MAP
2011 WL 3754693 (M.D. Fla. Aug. 18, 2011) ........ 12

<u>Statutes</u>

15 U.S.C. § 1052 ........ 22

15 U.S.C. § 1064 ........ 22

15 U.S.C. § 1119 ........ 21

15 U.S.C. § 1125 ........ 18

Fed. R. Civ. P. Rule 56 ........ 1, 10

<u>Other</u>

8 Fletcher Cyc. Corp. § 4004 ........ 14, 20

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*,
§ 20:46 (5th ed. 2019) ........ 22

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant/Counterclaimant World Tour Promoters, LLC ("WTP") moves the Court to enter judgment as a matter of law on all Counts of the First Amended Complaint (Doc. 34) filed by Plaintiff/Counterclaim Defendant North American Sport Karate Association, Inc. ("NASKA, Inc.") in the captioned cause. In addition, WTP moves the Court to enter judgment as a matter of law on Counts I and II of its First Amended Counterclaims. Judgment as a matter of law is appropriate on these counts because the uncontroverted facts demonstrate that NASKA, Inc. does not own and has never owned the "NASKA" service mark and its use of the "NASKA" service mark is causing the likelihood of confusion.

## I. STATEMENT OF UNCONTROVERTED FACTS

1. The North American Sport Karate Association was formed in 1986. *Declaration of Larry Carnahan in Support of Plaintiff's Motion for Preliminary Injunction* ("*Carnahan Declaration*"), ¶ 5 (Doc. 12); *Declaration of Michael McCoy in Support of Motion for Summary Judgment* ("*McCoy Declaration*"), ¶ 9, attached hereto as Exhibit A.

2. The North American Sport Karate Association was formed as an unincorporated association. Exhibit A, *McCoy Declaration*, ¶ 11.

3. The North American Sport Karate Association (hereinafter referred to as "Unincorporated NASKA") was formed by the promoters of the then-"A"

rated tournaments, which included the AKA Grand Nationals, the Battle of Atlanta, the Diamond Nationals, the New England Open, the Ocean State Grand Nationals, the U.S. Capitol Classics and the U.S. Open. Exhibit A, *McCoy Declaration*, ¶¶ 12; Exhibit B, *Deposition of Larry Carnahan* ("*Carnahan Depo.*"), 108:8-111:6; Exhibit 54.

4. Larry Carnahan was not, in his individual capacity, a promoter of any of the "A" rated tournaments that formed Unincorporated NASKA in 1986. Exhibit A, *McCoy Declaration*, ¶ 13; Exhibit B, *Carnahan Depo.*, 43:13-21.

5. Larry Carnahan was one of three members of JLB Promotions, LLC ("JLB") in 1986. Exhibit B, *Carnahan Depo.*, 43:18-44:4.

6. JLB was the promoter of the Diamond Nationals in 1986. Exhibit B, *Carnahan Depo.*, 43:18-44:4.

7. Unincorporated NASKA first conceived of and began using the "NASKA" service mark in commerce in 1986. *Carnahan Declaration*, ¶¶ 5 & 35 (Doc. 12); *Declaration of Hunter Lyon in Support of Plaintiff's Motion for Preliminary Injunction ("Lyon Declaration")*, ¶ 28 (Doc. 13); Exhibit A, *McCoy Declaration*, ¶ 16.

8. The "NASKA" service mark has been used in commerce continually since its first use in 1986. *Carnahan Declaration*, ¶¶ 5 & 35 (Doc. 12); *Lyon Declaration*, ¶ 28 (Doc. 13); Exhibit A, *McCoy Declaration*, ¶ 17.

9. Unincorporated NASKA never assigned its rights to the "NASKA" service mark to Larry Carnahan. Exhibit A, *McCoy Declaration*, ¶ 18; Exhibit B, *Carnahan Depo.*, 43:4-7, 111:7-10.

10. None of the promoters of the then-"A" rated tournaments that formed Unincorporated NASKA in 1986 assigned their rights to the "NASKA" service mark to Larry Carnahan. Exhibit A, *McCoy Declaration*, ¶ 19; Exhibit B, *Carnahan Depo.*, 43:4-7, 111:7-10.

11. None of the other members of JLB executed any document assigning their rights to the "NASKA" service mark to Larry Carnahan. Exhibit B, *Carnahan Depo.*, 44:5-45:21, 111:20-112:17.

12. None of the other members of JLB executed any document assigning the rights of JLB to the "NASKA" service mark to Larry Carnahan. Exhibit B, *Carnahan Depo.*, 44:5-45:21, 111:20-112:17.

13. Unincorporated NASKA was governed by a Board of Directors. Exhibit A, *McCoy Declaration*, ¶ 20; Exhibit B, *Carnahan Depo.*, 163:21-164:23.

14. The Board of Directors of Unincorporated NASKA was commonly referred to as the "NASKA Board." Exhibit A, *McCoy Declaration*, ¶ 21.

15. The NASKA Board was comprised of the promoters of each of the major NASKA-sanctioned tournaments. These tournaments were collectively known as the "NASKA World Tour." Exhibit A, *McCoy Declaration*, ¶ 22.

16. Although some promoters had multiple representatives on the NAKSA Board, each promoter received a single vote. Exhibit A, *McCoy Declaration*, ¶ 23; Exhibit B, *Carnahan Depo.*, 32:1-21.

17. Larry Carnahan was a member of the NASKA Board through JLB, the promoter of the Diamond Nationals. Larry Carnahan was JLB's representative on the NASKA Board. Exhibit A, *McCoy Declaration*, ¶ 24.

18. Larry Carnahan was elected in 1988 as NASKA's third President and continued in that role until 2026. Exhibit B, *Carnahan Depo.*, 29:11-30:6.

19. The NASKA Board authorized Larry Carnahan, as President of NASKA, to use the "NASKA" service mark to carry out tasks associated with his office, such as selecting and overseeing vendors providing services to the association. Exhibit A, *McCoy Declaration*, ¶ 25.

20. The members of the NASKA Board, by virtue of being members of the NASKA Board, were authorized to use the to use the "NASKA" service mark in connection with their tournaments. Exhibit A, *McCoy Declaration*, ¶ 26.

21. On February 26, 2026, the 12-member NASKA Board voted on whether to form WTP, a limited liability company organized under Florida law. Exhibit A, *McCoy Declaration*, ¶ 27; Exhibit C, *Declaration of Christine Bannon-Rodrigues* ("*Bannon-Rodrigues Declaration*"), ¶ 6; Exhibit D, *Declaration of Nick Smith* ("*Smith Declaration*"), ¶ 6; Exhibit E, *Declaration of Edwin Ruth* ("*Ruth Declaration*"), ¶ 6; Exhibit F, *Declaration of Bob Leiker* ("*Leiker Declaration*"), ¶ 6;

Exhibit G, *Declaration of Manny Reyes* ("*Reyes Declaration*"), ¶ 6; Exhibit H, *Declaration of Michael Palitti* ("*Palitti Declaration*"), ¶ 6.

22. On February 26, 2026, a majority of the 12-member NASKA Board voted in favor of forming WTP. Exhibit A, *McCoy Declaration*, ¶ 28; Exhibit C, *Bannon-Rodrigues Declaration*, ¶ 7; Exhibit D, *Smith Declaration*, ¶ 7; Exhibit E, *Ruth Declaration*, ¶ 7; Exhibit F, *Leiker Declaration*, ¶ 7; Exhibit G, *Reyes Declaration*, ¶ 7; Exhibit H, *Palitti Declaration*, ¶ *7.*

23. On February 26, 2026, a majority of the 12-member NASKA Board voted in favor of converting Unincorporated NASKA into WTP. Exhibit A, *McCoy Declaration*, ¶ 29; Exhibit C, *Bannon-Rodrigues Declaration*, ¶ 7; Exhibit D, *Smith Declaration*, ¶ 7; Exhibit E, *Ruth Declaration*, ¶ 7; Exhibit F, *Leiker Declaration*, ¶ 7; Exhibit G, *Reyes Declaration*, ¶ 7; Exhibit H, *Palitti Declaration*, ¶ *7.*

24. The vote of a majority of the NASKA Board was sufficient, on February 26, 2026, to authorize the conversion of the Unincorporated NASKA into WTP. Exhibit A, *McCoy Declaration*, ¶ 30.

25. The conversion of Unincorporated NASKA into WTP was effective as of March 4, 2026. Exhibit A, *McCoy Declaration*, ¶ 31; Exhibit C, *Bannon-Rodrigues Declaration*, ¶ 7; Exhibit D, *Smith Declaration*, ¶ 7; Exhibit E, *Ruth Declaration*, ¶ 7; Exhibit F, *Leiker Declaration*, ¶ 7; Exhibit G, *Reyes Declaration*, ¶ 7; Exhibit H, *Palitti Declaration*, ¶ *7.*

26. Following the formation of WTP, each member of the NASKA Board received a seat on the Board of Directors of WTP. Exhibit A, *McCoy Declaration*, ¶ 32; Exhibit C, *Bannon-Rodrigues Declaration*, ¶ 9; Exhibit D, *Smith Declaration*, ¶ 9; Exhibit E, *Ruth Declaration*, ¶ 9; Exhibit F, *Leiker Declaration*, ¶ 9; Exhibit G, *Reyes Declaration*, ¶ 9; Exhibit H, *Palitti Declaration*, ¶ 9.

27. Following the formation of WTP, the Board of Directors of WTP was referred to as the NASKA Board. Exhibit A, *McCoy Declaration*, ¶ 32.

28. On March 9, 2026, Mike McCoy was elected President of the NASKA Board. Exhibit A, *McCoy Declaration*, ¶ 33.

29. Larry Carnahan formed a Minnesota corporation known as "North American Sport Karate Association, Inc." (File No. 6G-24) in March 1989. *Carnahan Declaration*, ¶ 7 (Doc. 12).

30. The NASKA Board did not vote on whether to allow Larry Carnahan to form a Minnesota corporation known as "North American Sport Karate Association, Inc." (File No. 6G-24) in March 1989. Exhibit A, *McCoy Declaration*, ¶ 35.

31. The NASKA Board did not expressly authorize Larry Carnahan to form a Minnesota corporation known as "North American Sport Karate Association, Inc." (File No. 6G-24) in March 1989. Exhibit A, *McCoy Declaration*, ¶ 36.

32. Larry Carnahan did not request permission from the NASKA Board to form a Minnesota corporation known as "North American Sport Karate Association, Inc." (File No. 6G-24) in March 1989. Exhibit A, *McCoy Declaration*, ¶ 37.

33. Unincorporated NASKA never assigned its rights to the "NASKA" service mark to a Minnesota corporation known as "North American Sport Karate Association, Inc." (File No. 6G-24). Exhibit A, *McCoy Declaration*, ¶ 38.

34. Unincorporated NASKA continued conducting business after March 1989 utilizing the "NASKA" service mark. Exhibit A, *McCoy Declaration*, ¶ 39.

35. None of the promoters of the then-"A" rated tournaments that formed Unincorporated NASKA in 1986 assigned their rights to the "NASKA" service mark to a Minnesota corporation known as "North American Sport Karate Association, Inc." (File No. 6G-24). Exhibit A, *McCoy Declaration*, ¶ 40.

36. The Minnesota corporation known as "North American Sport Karate Association, Inc." (File No. 6G-24) was administratively dissolved on or about February 25, 2013. *Carnahan Declaration*, ¶ 8 (Doc. 12).

37. Larry Carnahan formed Plaintiff NASKA, Inc. (File No. 1213153300023) on January 26, 2021. *Carnahan Declaration*, ¶ 22 (Doc. 12).

38. The NASKA Board did not vote on whether to allow Larry Carnahan to form Plaintiff NASKA, Inc. (File No. 1213153300023) on January 26, 2021. Exhibit A, *McCoy Declaration*, ¶ 41.

39. The NASKA Board did not expressly authorize Larry Carnahan to form Plaintiff NASKA, Inc. (File No. 1213153300023) on January 26, 2021. Exhibit A, *McCoy Declaration*, ¶ 42.

40. Larry Carnahan did not request permission from the NASKA Board to form Plaintiff NASKA, Inc. (File No. 1213153300023) on January 26, 2021. Exhibit A, *McCoy Declaration*, ¶ 43.

41. Unincorporated NASKA never assigned its rights to the "NASKA" service mark to Plaintiff NASKA, Inc. (File No. 1213153300023). Exhibit A, *McCoy Declaration*, ¶ 44.

42. None of the promoters of the then-"A" rated tournaments that formed Unincorporated NASKA in 1986 assigned their rights to the "NASKA" service mark to Plaintiff NASKA, Inc. (File No. 1213153300023). Exhibit A, *McCoy Declaration*, ¶ 45.

43. None of the members of the NASKA Board as it existed from January 26, 2021, to the present assigned their rights to the "NASKA" service mark to Plaintiff NASKA, Inc. (File No. 1213153300023). Exhibit A, *McCoy Declaration*, ¶ 46.

44. NASKA, Inc. filed an application to register the "NASKA" service mark with the United States Patent and Trademark Office on June 10, 2024. *Carnahan Declaration*, ¶ 33 (Doc. 12).

45. In applying to register the "NASKA" service mark with the United States Patent and Trademark Office on June 10, 2024, NASKA, Inc. represented that it was the owner of the mark. *Carnahan Declaration*, ¶ 32 (Doc. 12); Exhibit A, *McCoy Declaration,*¶ 47..

46. Larry Carnahan was asked in his deposition, "did any member of the NASKA Board assign you their right to the NASKA trademark?" and answered, "I don't remember." Exhibit B, *Carnahan Depo.*, 43:4-7.

47. Larry Carnahan acknowledged in his deposition there was no document reflecting an assignment of the "NASKA" service mark to him. Exhibit B, *Carnahan Depo.*, 111:7-112:17.

48. Larry Carnahan confessed in his deposition he could not say how he acquired an ownership interest in the NASKA business. Exhibit B, *Carnahan Depo.*, 270:20-272:2.

49. Plaintiff NASKA, Inc. is using the same "NASKA" service mark as WTP. Exhibit A, *McCoy Declaration,*¶ 48.

50. Use of the "NASKA" service mark by both Plaintiff NASKA, Inc. and WTP is causing a likelihood of confusion. *Lyon Declaration*, ¶¶ 40 & 48 (Doc. 13); *Carnahan Declaration*, ¶¶ 47 & 55 (Doc. 12).

51. Use of the "NASKA" service mark by both Plaintiff NASKA, Inc. and WTP is causing actual confusion. Exhibit I, *Defendant's Responses to Plaintiff's First Set of Interrogatories*, Response No. 12.

## II. ARGUMENT

### A. Legal Standards

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)(citations omitted). "A federal court must grant summary judgment if the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Pan Ocean Co., Ltd. v. World Fuel Services (Singapore) Pte., Ltd.*, Case No. 23-20014-CIV-ALTONAGA/Damian, 2024 WL 216279, at *3 (S.D. Fla. Jan. 19, 2024)(citing Fed. R. Civ. P. 56(a), (c)).

"If the moving party bears the burden of proof on the relevant issue at trial, it can meet its summary judgment burden only 'by presenting affirmative evidence showing the absence of a genuine issue of material fact — that is, facts that would entitle it to a directed verdict if not controverted at trial.'" *Id.* (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)). "If the moving party does not bear the burden of proof on the relevant issue at trial, it need only show 'that there is an absence of evidence to support the non-moving party's case.'" *Id. (citing Fitzpatrick*, 2 F.3d at 1116). "Once the movant discharges its initial burden, the non-moving party 'must set forth specific facts showing that

there is a genuine issue for trial." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

**B. <u>WTP is Entitled to Judgment as a Matter of Law on Each and Every Claim in the First Amended Complaint Because the Uncontroverted Facts Demonstrate that Plaintiff NASKA, Inc. Does Not Own the "NASKA" Service Mark</u>**

The First Amended Complaint filed by NASKA, Inc. asserts claims for federal trademark infringement and unfair competition under the Lanham Act (Count I), common law trademark infringement and unfair competition (Count II), violation of the anti-cybersquatting consumer protection act (Count III), tortious interference with business relationships (Count IV), and civil conspiracy (Count V). Each of these claims depends upon the proposition that NASKA, Inc., and not WTP, is the rightful owner of the "NASKA" service mark:

- Count I alleges WTP "willfully infringed upon Plaintiff's rights in its federally-registered NASKA mark in violation of 15 U.S.C. § 1114." *First Amended Complaint* (Doc. 34), ¶ 179.

- Count II alleges NASKA, Inc. "owns valuable common law rights and goodwill in the NASKA marks as a result of its continuous use of the marks in Florida and elsewhere." *Id.*, ¶ 184.

- Count III alleges WTP registered the domain name <naskatour.com> "in complete disregard of Plaintiff's exclusive rights in and to the NASKA marks." *Id.*, ¶ 190.

- Count IV alleges WTP "wrongfully interfered" with certain business relationships "in the manner described in the Complaint" and that such interference consisted of WTP's infringing use of the NASKA marks. *Id.*, ¶¶ 172, 174, 199.

- Count V alleges "[t]he Promoter Defendants have agreed, either expressly or tacitly, to jointly engage in a common scheme to misappropriate the NASKA name and mark, seize control of the NASKA business, exclude Plaintiff from control of NASKA operations and assets, and divert Plaintiff's goodwill to Defendant World Tour." *Id.*, ¶ 203.

Because NASKA, Inc. registered the "NASKA" service mark with the United States Patent and Trademark Office, there is a presumption that NASKA, Inc. is the owner of the mark and that the mark is valid. *Z Productions, Inc. v. SNR Productions, Inc.*, No. 8:10-CV-966-T-23MAP, 2011 WL 3754693, at *4 (M.D. Fla. Aug. 18, 2011). But this presumption is "easily rebuttable, since it merely shifts the burden of production to the alleged infringer." *Thoroughbred Legends, LLC v. The Walt Disney Co.*, Civil No. 1:07-CV-1275-BBM, 2008 WL 616253, at *8 (N.D. Ga. Feb. 12, 2008)(citing *Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 486 (7th Cir. 2007)); *see also Z Productions, Inc.*, 2011 WL 3754693, at *4 (registration shifts the burden of production). "Where a defendant demonstrates 'through law, undisputed facts, or a combination thereof'" that the registrant does not own the mark or that the mark is invalid, "the plaintiff cannot survive summary judgment." *White v. Toscano, Inc.*, Case No. 8:04-cv-2438-T-26MSS, 2005 WL 8160219, at *2 (M.D. Fla. Oct. 11, 2005); *see also Jordan International, Inc. v. United Industries Sales Organization, Inc.*, 699 F. Supp. 268, 270 (S.D. Fla. 1988)(observing that "registration does not alter the plaintiff's burden of proof in an infringement action.").

The uncontroverted facts clearly and unequivocally demonstrate NASKA, Inc. does not own and has never owned the "NASKA" service mark, therefore Defendants are entitled to judgment as a matter of law on each of Plaintiff's claims.

**1. Plaintiff NASKA Inc. is Not an Original Owner of the "NASKA" Service Mark**

"Rights in a [service mark] are determined by the date of the mark's first use in commerce. The party who first uses a mark in commerce is said to have priority over other users." *Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 419 (2015).

Plaintiff NASKA, Inc. was not the first party to use the "NASKA" service mark in commerce. The "NASKA" service mark was first conceived of and commercialized by Unincorporated NASKA in 1986. *SOF*, ¶¶ 7-8. Unincorporated NASKA used the mark continuously thereafter until March 2026, when Unincorporated NASKA incorporated as WTP. *SOF*, ¶¶ 8, 21-25. This made Unincorporated NASKA the original owner of the mark and made WTP its successor in interest. *See Hana Bank*, 574 U.S. at 419 ("The party who first uses a mark in commerce is said to have priority over other users"); *see also SB Initiative, Inc. v. Cheekwood Botanical Garden and Museum of Art*, No. 3:24-cv-00821, 2024 WL 4279510, at *6 (M.D. Tenn. Sept. 24, 2024)(an unincorporated association can own a trademark); *Southern California Darts Ass'n v. Zaffina*, 762 F.3d 921, 930 (9th Cir. 2014)(same); *Bible Way Church of Our Lord Jesus Christ World Wide, Inc. v.*

*Showell*, 260 F.R.D. 1, 3 (D.D.C. 2009)(same); *Third Education Group, Inc. v. Phelps*, 675 F. Supp.2d 916, 921-22 (E.D. Wis. 2009)("The incorporation of a voluntary association, if the act of the association and not the unauthorized step of some of its members, merges the association in the corporation, and its property becomes the property of the corporation.")(citing 8 Fletcher Cyc. Corp. § 4004).

Plaintiff NASKA, Inc. did not even exist until January 2021, almost four decades after the "NASKA" service mark was first conceived of and commercialized. *SOF*, ¶¶ 7-8, 37. Accordingly, Plaintiff NASKA, Inc. cannot be and does not claim to be an original owner of the mark.

**2. Larry Carnahan is Not an Original Owner of the "NASKA" Service Mark**

Just as Plaintiff NASKA, Inc. cannot claim to be an original owner of the "NASKA" service mark, Larry Carnahan cannot claim to be an original owner of the mark. The mark was conceived of and commercialized by Unincorporated NASKA and not by Carnahan individually. *SOF*, ¶¶ 2-8.

Furthermore, even if—as Plaintiff has argued in prior filings—Unincorporated NASKA cannot own the mark because it is an unincorporated association, that would not vest ownership in Carnahan. Carnahan was not, individually, a founder or original member of Unincorporated NASKA. *SOF*, ¶¶ 2-6.

Unincorporated NASKA was founded by the promoters of the then-"A" rated sport karate tournaments. *SOF*, ¶ 3. Carnahan was not one of these promoters. Rather, he was one of three members of a limited liability company known as JLB. *SOF*, ¶¶ 4-5. JLB, not Carnahan individually, promoted the Diamond National tournament. *SOF*, ¶ 6. JLB, not Carnahan individually, was one of the founders of Unincorporated NASKA. *SOF*, ¶¶ 2-6.

To the extent Unincorporated NASKA was unable, as an unincorporated association, to own the "NASKA" service mark, the mark would have been owned beneficially by its founders and members. *See Murray v. Sevier*, 156 F.R.D. 235 (D. Kan. 1994)( "[P]roperty used and ostensibly owned by the association is in fact the property of its members. Such property is beneficially owned in common by the members in equal shares."). JLB was a founder and member of Unincorporated NASKA. Carnahan individually was not. *SOF*, ¶¶ 2-6. Accordingly, Carnahan cannot claim to have individually owned the "NASKA" service mark.

**3. The "NASKA" Service Mark was Never Assigned to Plaintiff NASKA, Inc. or to Larry Carnahan**

Based on the allegations in the First Amended Complaint, Plaintiff's claim to the "NASKA" service mark appears to rest entirely on the allegation that Larry Carnahan formed a Minnesota corporation called NASKA, Inc. in 1989 (the "1989 Corporation") and that "he and the other promoters allowed their joint

ownership rights in the NASKA marks to pass to the 1989 Corporation." *First Amended Complaint*, ¶ 57. Then, when the 1989 Corporation was dissolved in February 2013, rights to the service mark passed back to Carnahan before being transferred to Plaintiff upon its formation in January 2021. *Id.* ¶¶ 105, 113-19.

This theory—that the founders of Unincorporated NASKA "allowed" their ownership interest in the "NASKA" mark to pass to a since-dissolved corporation that Carnahan formed in 1989—will not suffice to create a jury question on the issue of ownership. To transfer ownership of a common law trademark, an *assignment* is required. *Fitz v. Nunez*, Civil Action no. 3:23-CV-2298-B, 2025 WL 2856306, at *5 (N.D. Tex. Oct. 8, 2025)(citing *Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.*, 80 F.4th 607, 618 (5th Cir. 2023)). Although the assignment need not be in writing,[1] there must be "strong evidence" of the assignment, *id.*, such as "the clear and uncontradicted oral testimony of a person in a position to have actual knowledge." *TMT North America, Inc. v. Magic Touch*, 124 F.3d 876, 884 (7th Cir. 1997). "Requiring strong evidence to establish an assignment is appropriate both to prevent parties from using self-serving testimony to gain ownership of trademarks and to give parties incentives to identify expressly the ownership of the marks they employ." *Id.*

[1] The "NASKA" mark was not registered until after the alleged transfer of ownership took place. Had it been registered at the time of the transfer, a written assignment would have been necessary to transfer ownership. *Fitz*, 2025 WL 2856306, at *5.

Plaintiff cannot show and does not even allege that any assignment occurred. This is because there was no assignment. At no point did Unincorporated NASKA ever assign its rights in the "NASKA" service mark to Plaintiff, to Larry Carnahan (the sole owner of NASKA, Inc.) or to any other entity owned by Larry Carnahan. *SOF*, ¶¶ 33, 41-43. At no point did any of the promoters who founded Unincorporated NASKA in 1986 ever assign their rights in the "NASKA" service mark to Plaintiff, to Larry Carnahan (the sole owner of NASKA, Inc.) or to any other entity owned by Larry Carnahan. *SOF*, ¶¶ 33, 35, 41-43. This simply did not happen, and Plaintiff has no evidence to the contrary.

Larry Carnahan was asked about this issue during his deposition. The question was straightforward: "[D]id any member of the NASKA Board assign you their right to the NASKA trademark?" *SOF*, ¶ 46. Larry Carnahan answered simply, "I don't remember." *SOF*, ¶ 46. Beyond this testimony, Larry Carnahan acknowledged there was no document reflecting an assignment. *SOF*, ¶ 47. And he ultimately confessed he could not say how he acquired his purported ownership interest in the NASKA business. *SOF*, ¶ 48. This is not the sort of "strong evidence" that will show an assignment took place.

Because neither Plaintiff NASKA, Inc. nor Larry Carnahan were original owners of the "NASKA" service mark and cannot demonstrate that the mark was ever assigned to them, they cannot show Plaintiff owns the mark now. As a

result, Plaintiff's claims fail as a matter of law and uncontroverted fact, and summary judgment should be entered in favor of Defendants.

**C. <u>WTP is Entitled to Judgment as a Matter of Law on Counts I and II of the First Amended Counterclaims</u>**

WTP has asserted counterclaims against Plaintiff NASKA, Inc. for, among other things, false designation of origin under the Lanham Act (Count I) and cancellation of the service mark registration (Count II). WTP is entitled to judgment as a matter of law on these counterclaims because the uncontroverted facts show that Plaintiff NASKA, Inc. does not own and have never owned the "NASKA" service mark and Plaintiff's use of the mark was and is likely to cause confusion.

**1. WTP is Entitled to Judgment as a Matter of Law on its Counterclaim for False Designation of Origin**

"The essential elements of a false designation of origin cause under 15 U.S.C. § 1125(a) are: (1) the plaintiff is the prior owner of the trademark or service mark and (2) the defendant adopted a mark that is the same or confusingly similar to plaintiff's mark so that there exists a likelihood of confusion to consumers as to the proper origin of the goods or services, such that a consumer is likely to believe that defendant's goods or services are being sold with the consent or authorization of the plaintiff or that defendant is affiliated with or connected to the plaintiff." *Sesderma, S.L. v. Mediderm Labs.*, Case No. 1:19-cv-22333-GAYES, 2020 WL 4905403, at *1 (S.D. Fla. Feb. 21, 2020)(citing *Conagra, Inc.*

*v. Singleton*, 743 F.2d 1508, 1512 (11th Cir. 1984). The uncontroverted facts demonstrate each of these elements is satisfied and WTP is entitled to judgment as a matter of law.

**a. WTP is the Prior Owner of the "NASKA" Service Mark**

The uncontroverted facts demonstrate WTP is the prior owner of the "NASKA" service mark. The "NASKA" service mark was first conceived of and commercialized by Unincorporated NASKA in 1986. *SOF*, ¶ 7. Unincorporated NASKA used the mark continuously thereafter until March 2026. *SOF*, ¶¶ 7-8. This made Unincorporated NASKA the original owner of the mark. *See Hana Bank*, 574 U.S. at 419 ("The party who first uses a mark in commerce is said to have priority over other users"); *see also SB Initiative, Inc.*, 2024 WL 4279510, at *6 (an unincorporated association can own a trademark); *Zaffina*, 762 F.3d at 930 (same); *Bible Way Church of Our Lord Jesus Christ World Wide, Inc. v. Showell*, 260 F.R.D. 1, 3 (D.D.C. 2009)(same).

On February 26, 2026, the NASKA Board voted in favor of converting Unincorporated NASKA into WTP. *SOF*, ¶¶ 21-24. This conversion became effective March 4, 2026. *SOF*, ¶ 25. At that point, the property of Unincorporated NASKA—including its rights to the "NASKA" service mark—became the property of WTP. *Phelps*, 675 F. Supp.2d at 921-22 ("The incorporation of a voluntary association, if the act of the association and not the unauthorized step of some of its members, merges the association in the

corporation, and its property becomes the property of the corporation.")(citing 8 Fletcher Cyc. Corp. § 4004).

Plaintiff NASKA, Inc. does not own and have never owned the "NASKA" service mark.

**b. Plaintiff NASKA, Inc. is Using the Same Mark as WTP and Creating a Likelihood of Confusion**

It is uncontroverted that Plaintiff NASKA, Inc. has adopted the same "NASKA" service mark as is used by WTP. *SOF*, ¶ 49. Ordinarily, the Court would be required to undertake a multifactor analysis to determine whether Plaintiff's use of the mark was creating a likelihood of confusion. The factors considered include: "(1) the strength of the [counterclaimant's] mark; (2) the similarity between the [counterclaimant's] mark and the allegedly infringing mark; (3) the similarity between the products and services offered by the [counterclaimant's] and [counterclaim] defendant; (4) the similarity of the sales methods, i.e., retail outlets or customers; (5) the similarity of advertising methods; (6) the [counterclaim] defendant's intent, e.g., does the [counterclaim] defendant hope to gain competitive advantage by associating his product with the [counterclaimant's] established mark; and (7) the most persuasive factor on likely confusion is proof of actual confusion." *Conagra, Inc. v. Singleton*, 743 F.2d 1508 (11th Cir. 1984). These factors would be easily satisfied here; the parties are using an identical service mark to market identical services, that mark has been

associated with these services for over four decades, and there is evidence customers are actually being confused. *SOF*, ¶¶ 49-51.

Yet, in this case, no analysis is necessary because Plaintiff NASKA, Inc. has admitted in declarations from its President (Hunter Lyon) and its sole owner (Larry Carnahan) there is a likelihood of confusion. *SOF,* ¶ 50. Based on these admissions alone, this Court can and should find this element satisfied. *See Nu Pagamentos S.A. - Instituicao de Pagamento v. Hudson*, Civil Action No. 2:21-CV-69-RWS, 2023 WL 2377641, at *9 (N.D. Ga. Feb. 22. 2023)("Courts may rule on likelihood of confusion as a matter of law when appropriate."). As a result, and because WTP is the prior owner of the mark, judgment as a matter of law can and should be entered on WTP's claim for false designation of origin.

**2. WTP is Entitled to Judgment as a Matter of Law on its Counterclaim for Cancellation of Plaintiff's Service Mark Registration**

"Federal courts can cancel a registered mark under [15 U.S.C. § 1119] if the challenger to the registration demonstrates: "(1) that it has standing to petition for cancellation because it is likely to be damaged, and (2) that there are valid grounds for discontinuing registration." *Pinnacle Advertising and Marketing Group, Inc. v. Pinnacle Advertising and Marketing Group, LLC*, 7 F4th 989, 1004 (11th Cir. 2021)(citations omitted). "When … the mark at issue has been registered for less than five years, the 'valid grounds for discontinuing registration include any reason for which the registration should have been barred in the first instance.'"

*Id.* One such ground is that the mark "[c]onsists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1052(d).

**a. WTP Has Standing**

"The Lanham Act broadly provides that a trademark-cancellation proceeding may be initiated by 'any person who believes that he is or will be damaged ... by the registration of a mark.'" *Royal Palm Properties, LLC v. Pink Palm Properties, LLC*, 950 F.3d 776, 788 (11th Cir. 2020)(citing 15 U.S.C. § 1064). "The purpose of this requirement is merely to ensure that the challenger has a 'direct and personal stake in the outcome' and is not a 'mere intermeddler[ ].'" *Id.* (citing *Ritchie v. Simpson*, 170 F.3d 1092, 1095 (Fed. Cir. 1999)). "As a general matter, then, the Lanham Act sets a low statutory-standing bar: 'The requirement for standing [to pursue a trademark-cancellation claim] is fairly easy to satisfy in the vast majority of cases.'" *Id.* (citing J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 20:46 (5th ed. 2019)).

The standing requirement is clearly satisfied in this case. WTP is using the service mark that Plaintiff NASKA, Inc. improperly registered and WTP is being sued over such use. WTP thus has a "direct and person stake in the outcome" of these proceedings.

**b. Use of the "NASKA" Service Mark by Plaintiff NASKA, Inc. is Likely to Cause Confusion**

Plaintiff NASKA, Inc. has admitted in declarations from its President (Hunter Lyon) and its sole owner (Larry Carnahan) there is a likelihood of confusion. *SOF,* ¶ 50. Based on these admissions alone, this Court can and should find this element satisfied. *See Hudson*, 2023 WL 2377641, at *9 ("Courts may rule on likelihood of confusion as a matter of law when appropriate."). As a result, and because the uncontroverted facts show WTP is the prior owner of the mark, judgment as a matter of law can and should be entered on WTP's claim for cancellation of Plaintiff's trademark registration.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment should be granted. The Court should grant summary judgment on each count of Plaintiff's First Amended Complaint and on Counts I and II of WTP's First Amended Counterclaims.

Dated: August 7, 2026

Respectfully submitted,

*/s/ David L. Marcus*
David L. Marcus (*Pro Hac Vice)*
DLM LAW LLC
1100 Main Street, Suite 2730
Kansas City, Missouri 64105
Telephone: 816.285.3888
Fax: 816.222.0534
dmarcus@dlmlaw.com

and

Gilbert A. Schaffnit, FL #249769
719 NE 1st Street
Gainesville, Florida 32601
Telephone: 352.378.6593
gaslaw@gmail.com

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 7, 2026, a true and correct copy of the above and foregoing was filed with the Clerk of the Court by using the CM/ECF electronic filing system, which will send notification of such filing to all counsel of record.

*/s/ David L. Marcus*
*Attorney for Defendants*