**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**NORTH AMERICAN SPORT KARATE ASSOCIATION INC.**, a Minnesota corporation,

**Plaintiff/Counterclaim Defendant,**

**v.** **Case No.: 6:26-cv-00752-GAP-RMN**

**WORLD TOUR PROMOTERS, LLC**, a Florida limited liability company,

**Defendant/Counterclaimant,**

**MICHAEL McCOY**, an individual,
**PRO-KICK PRODUCTIONS, LLC,** a Florida limited liability company,
**AKI ENTERPRISES LLC,** a Missouri limited liability company,
**MON ART QUEBEC,** a Canadian corporation,
**13579441 CANADA, INC.**, a Canadian corporation,
**TRUTH ENTERTAINMENT LLC,** a Tennessee limited liability company,
**DON RODRIGUES KARATE ACADEMY, LTD.,** a Rhode Island corporation,

**Defendants.**
_______________________________/

**PLAINTIFF NORTH AMERICAN SPORT KARATE ASSOCIATION INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff, North American Sport Karate Association Inc. ("***NASKA Inc.***"), by and through its undersigned counsel and pursuant to Federal Rule of Civil Procedure 56, moves this Court for partial summary judgment on the First Amended Counterclaims ("***Counterclaims***") asserted by Defendant, World Tour Promoters, LLC ("***WTP***"). WTP's Counterclaims—spanning claims for unfair competition under the Lanham Act, cancellation of NASKA Inc.'s federal service mark registration, declaratory judgment of ownership, conversion, accounting and constructive trust, fraud on the USPTO, tortious interference, and violation of Florida's Deceptive and Unfair Trade Practices Act—all depend on a single, indispensable predicate: that WTP owns the "North American Sport Karate Association" or "NASKA" marks (the "***NASKA marks***") and business (the "***NASKA business***"). The undisputed record eliminates that predicate at its source. Larry Carnahan—not any unincorporated association, and certainly not WTP—has owned the NASKA marks and business at all relevant times, and no unincorporated association known as the "North American Sport Karate Association" or "NASKA" ever existed as a legal entity capable of owning, let alone transferring, anything to WTP. This Motion, though, turns solely on the rights of WTP.

Focusing first on Mr. Carnahan's rights by way of background, the record contains repeated, contemporaneous acknowledgments—by NASKA Board members, tournament promoters, and Mr. McCoy himself—that Mr. Carnahan alone owns NASKA and the NASKA marks and business. Mr. Carnahan

incorporated the NASKA business in Minnesota in 1989, was its sole shareholder, director, and officer, and, after that corporation's 2013 administrative dissolution, continued to personally own and operate the NASKA business and marks before assigning them to Plaintiff in 2021, of which he remains the sole shareholder. **Exhibit A**, Declaration of Larry Carnahan ("***Carnahan Decl.***") ¶¶ 18–21, 36–38, 49–56. Every other Board member confirms the same: Mr. Lyon and Mr. Brown each declare that they have "always considered Larry Carnahan and/or NASKA, Inc. to be the owners of the NASKA business," that they never believed they held any ownership interest in it, and that they would not have expected to share in proceeds had it ever been sold. **Exhibit B**, Declaration of Hunter Lyon ("***Lyon Decl.***") ¶¶ 13, 22, 24, 26; **Exhibit C**, Declaration of Dennis Brown ("***Brown Decl.***") ¶¶ 15, 22–25. Mr. Lyon testified at his deposition that "everybody knew" Mr. Carnahan "was the owner" of NASKA, and read into the record Mr. Carnahan's own bylaws stating that "Larry Carnahan, owner, is the sole shareholder." **Exhibit D**, Deposition of Hunter Lyon ("***Lyon Dep.***") 353:12–13, 362:25–363:2. The former Commissioner of NASKA, Charlie Lee, likewise testified that the question of who owned NASKA "never entered my mind" because "I always thought Larry was the president of NASKA . . . to the present day," and that Mr. Carnahan "was the leader of NASKA" and that this "was well known for decades." **Exhibit E**, Deposition of Charlie Lee ("***Lee Dep.***") 25:18–26:14, 31:22–32:3.

Mr. McCoy's own contemporaneous statements are the most telling of all. In a February 2025 email, Mr. McCoy referred to Mr. Carnahan as "owner of NASKA and the only officer." Lyon Decl. ¶ 27.a, Ex. 1. In a November 2025 email copied to the entire NASKA Board, Mr. McCoy told Mr. Carnahan: "Your call, you're the President, Owner and the only one with any authority and power at this point. Until we have bylaws that state otherwise, there isn't even a Board." Am. Compl. (Doc. 34) ¶ 124, Ex. 9; Lyon Decl. ¶ 27.e, Ex. 5. In a November 12, 2025 planning call, Mr. Russo likewise recognized "Larry Carnahan and his ownership of NASKA" as a given around which any executive committee would have to be built, and Mr. McCoy told the group that Mr. Lyon "works for Larry, who is the sole officer, sole technically director," expressly disclaiming that McCoy himself had ever been "nominated, elected, or agreed to" any director position. Lyon Decl. ¶ 28.a, Ex. 7, Nov. 12, 2025 Mtg. Tr. 1:54–2:22, 40:02–40:52. On November 20, 2025, Mr. McCoy told the Board that any new bylaws "will become the bylaws of the corporation that [Carnahan] owns, and he becomes the only owner, and the only officer." Lyon Decl. ¶ 28.c, Ex. 9, Nov. 20, 2025 Mtg. Tr. 50:26–51:20. And when the Board debated who should sit on a proposed executive committee on November 17, 2025, Mrs. Brown told Mr. Carnahan directly, "Larry, you're the king of the hill." Lyon Decl. ¶ 28.b, Ex. 8, Nov. 17, 2025 Mtg. Tr. 35:56–36:05.

The same witnesses who acknowledge Mr. Carnahan's ownership likewise confirm that no unincorporated association ever existed to own anything in the first place. Mr. Lyon testified that, before this lawsuit, he had "never" heard the

term "unincorporated association" used in connection with NASKA, that he would not "categorize" NASKA as an unincorporated association—a term he called one he had "never heard . . . before this case"—and that "there wasn't a known unincorporated association." Lyon Dep. at 258, 325–326, 373–374. NASKA's first president, Jim Lantrip, testified that NASKA "was kind of a loose organization . . . nobody was in charge" and that he "didn't think anybody owned it." **Exhibit F**, Deposition of Jim Lantrip ("***Lantrip Dep.***") 18:13–15, 19:1–2. And during the very meetings in which Defendants now claim a vote occurred to convert "Unincorporated NASKA" into WTP, the participants said the opposite. On February 25, 2026, Mr. McCoy told the group, "There is no board," and that "[w]e don't own NASKA. We don't have the authority to make those statements." Lyon Decl. ¶ 34.a., Ex. 13, Feb. 25, 2026 Mtg. Tr. 6:49–6:57, 46:45–48:27. Mr. Ruth agreed that the group could not "legally do anything as an organization until we get our organization legal." Lyon Decl. ¶ 34.d., Ex. 13, Feb. 25, 2026 Mtg. Tr. 46:55–47:39. The next day, Mr. Sawyer confirmed that no legal entity existed to hold the NASKA marks because Mr. Carnahan was "the only one that's in the corporation." Lyon Decl. ¶ 35.b., Ex. 14[1], Feb. 26, 2026 Mtg. Tr. 24:56–25:57, 32:51–33:42. And on February 27, 2026, Mr. Sawyer warned the Board that "we just don't have a legal NASKA entity," proposing that the group "[c]reate the LLC"

[1] Upon request of the Court, Plaintiff will provide the audio recording of the February 26, 2026 meeting that this transcript transcribes for review of the Court.

precisely because no entity yet existed. Lyon Decl. ¶ 36.a., Ex. 15, Feb. 27, 2026 Mtg. Tr. 1:20:54–1:21:49.

The sum total of this undisputed evidence is that Mr. Carnahan, not any unincorporated association and not WTP, owns the NASKA marks and business, and that there is not now, and never has been, a legally cognizable unincorporated association known as the "North American Sport Karate Association" or "NASKA" capable of owning or transferring anything. Because every one of WTP's eight Counterclaims depends on WTP's ownership of the NASKA marks and business, and because WTP can point to no chain of title running through an entity that never existed, summary judgment must be granted against WTP's Counterclaims.

Turning to the focus of this Motion, even assuming for purposes of argument an unincorporated association known as the "North American Sport Karate Association" or "NASKA" existed and in February 2026 owned the NASKA marks and business, none of its rights could have possibly been transferred to WTP. This is the case for multiple independent, indisputable reasons:

- First, there was no unanimous vote to convert the unincorporated association into WTP. Indeed, there was no vote at all.
- Second, there is no statutory mechanism in Florida that permits conversion of an unincorporated association into a Florida limited liability company.
- Third, even if U-NASKA is subject to Florida partnership law, if there was such a vote, it was not in, or evidenced by, a statutorily required "record."

- Fourth, there was no statutorily-required registration statement or certificate of conversion filed to effectuate a conversion.
- Last, Mr. McCoy did not execute any assignment of rights from the unincorporated association to WTP.

As a result, WTP cannot establish ownership of the NASKA marks and business, and thus lacks standing to assert its Counterclaims against NASKA Inc. WTP's Counterclaims should be dismissed, with prejudice.

## I. FACTUAL BACKGROUND

1. The "North American Sport Karate Association" and "NASKA" names and marks have been continuously used in the sport karate community since 1986 for a sanctioning, rating, and regulation system for competitive sport karate. Carnahan Decl. ¶¶ 10–12; Brown Decl. ¶¶ 8–9.

2. At the time NASKA was founded, the promoters did not discuss any individual or group jointly or collectively owning the NASKA business. Carnahan Decl. ¶ 14; Brown Decl. ¶ 9. They were independent tournament promoters participating in a common sanctioning and ratings system, not partners or joint venturers, and they did not share each other's profits, losses, or liabilities. Carnahan Decl. ¶¶ 9, 14; Brown Decl. ¶¶ 7, 9; Lyon Decl. ¶ 17; Lee Dep. 44:14–24; Lantrip Dep. 18:13–15, 19:1–2 ("[NASKA] was kind of a loose organization . . . nobody was in charge"; "[I] didn't think anybody owned it."). Mr. McCoy himself admitted that when members of the NASKA Board left, their interest was simply "gone. They just left," and there was no "written document terminating their

membership or board seat." **Exhibit G**, Deposition of Mike McCoy ("***McCoy Dep.***") 117:14–19.

3. No Board member received a property interest by joining or relinquished one by leaving, and the Board never adopted governance rules or bylaws. Carnahan Decl. ¶ 15; Brown Decl. ¶ 10; Lyon Decl. ¶ 18; Lantrip Dep. 32:23–33:2.

4. Mr. Carnahan incorporated the NASKA business in Minnesota in 1989 as North American Sport Karate Association, Inc. ("***NASKA, Inc.***"), was its sole shareholder, director, and officer, and formed it to operate the NASKA business and marks. Carnahan Decl. ¶¶ 18–21; Brown Decl. ¶¶ 14–15; Lyon Decl. ¶¶ 12–13; Lee Dep. 79:23–25.

5. NASKA, Inc. federally registered the NASKA mark, listing NASKA, Inc. as the owner. The application was published for opposition, and no one claimed inconsistent rights. Carnahan Decl. ¶¶ 23–26.

6. NASKA, Inc. had a federal employer identification number, maintained bank accounts, filed tax returns, entered contracts, registered "NASKA" as an assumed name, and publicly distributed materials identifying itself as "NASKA Inc." Carnahan Decl. ¶¶ 29–35; Lee Dep. 112:24–113:15, 115:1–9.

7. After NASKA, Inc. administratively dissolved in 2013, its remaining property was distributed to Mr. Carnahan as its sole shareholder under Minnesota corporate state law, and he continued to own and operate the NASKA business and marks. Carnahan Decl. ¶¶ 36–38.

8. In 2021, Mr. Carnahan incorporated Plaintiff, held Plaintiff's only issued share, and assigned Plaintiff all right, title, and interest in the NASKA marks. Carnahan Decl. ¶¶ 49–56.

9. Plaintiff filed the current NASKA application with the USPTO on June 10, 2024, and the USPTO issued U.S. Registration No. 7,721,429 to Plaintiff on March 11, 2025 for Class 41 services. Carnahan Decl. ¶¶ 61–64. The Registration remains issued and has not been cancelled, revoked, or abandoned. Carnahan Decl. ¶ 64.

10. The NASKA Board advised Mr. Carnahan on matters of common interest, such as rules changes, but it was not a corporate board with governance authority, ownership, or control over the NASKA business or marks. Carnahan Decl. ¶¶ 39–42; Brown Decl. ¶¶ 11, 17; Lyon Decl. ¶¶ 16, 20–22. Board members never believed they owned the NASKA business or marks and did not expect sale proceeds because they did not own the business. Brown Decl. ¶¶ 11, 25; Lyon Decl. ¶¶ 22, 26.

11. Board members and promoters, including McCoy, repeatedly acknowledged Mr. Carnahan's ownership.

12. In February 2025, McCoy stated that "Larry, as owner of NASKA and the only officer, needs to make the decision" and that he had "no authority to decide." Lyon Decl. ¶ 27.a, Ex. 1. In November 2025, McCoy stated that Mr. Carnahan was "the President, Owner and the only one with any authority and

power." Lyon Decl. ¶ 27.e, Ex. 5. In March 2026, McCoy referred to "your company NASKA Inc." Carnahan Decl. ¶ 14, Ex. 14.

13. Defendants understood that they had no ownership of or authority over the NASKA business or marks. During a February 25, 2026 meeting, McCoy stated: "We really don't have any authority to do anything until we fix that," and acknowledged that "a verbal from Larry or even an email is not enough. There has to be some kind of contract, employment or officer contract for elections or minutes or something that officially designates us as officers or directors of the company. There is nothing official." Lyon Decl. ¶ 34.a, Ex. 13, Feb. 25, 2026 Mtg. Tr. 2:36–3:06, 6:03–6:49. McCoy went further: "I'm not an owner [of NASKA]. I'm not an officer and I'm not a director. I'm nothing. I'm just a person who has a vested interest in the success of your company." Lyon Decl. ¶ 34.a, Ex. 13, Feb. 25, 2026 Mtg. Tr. 6:49–6:57. McCoy later acknowledged: "We don't own NASKA. We don't have the authority to make those statements." Lyon Decl. ¶ 34.b, Ex. 13, Feb. 25, 2026 Mtg. Tr. 46:45–48:27.

14. Other participants echoed McCoy. Bob Leiker stated the group members "don't own the name to it" and are "individual business people." Lyon Decl. ¶ 34.c, Ex. 13, Feb. 25, 2026 Mtg. Tr. 23:11–23:50. Greg Ruth acknowledged: "[W]e cannot legally do anything as an organization until we get our organization legal," and "[n]either one of us are willing to do anything because we don't own NASKA." Lyon Decl. ¶ 34.d, Ex. 13, Feb. 25, 2026 Mtg. Tr. 46:55–47:39, 55:10–55:30. Mr. Lyon confirmed: "NASKA is an independently owned organization, and

we all independently own our own events." Lyon Decl. ¶ 34.e, Ex. 13, Feb. 25, 2026 Mtg. Tr. 29:11–29:38.

15. In December 2025, the newly formed NASKA Executive Committee adopted a resolution recognizing that its purpose was "to support Mr. Carnahan in running NASKA's day-to-day operations more efficiently" and that "Mr. Carnahan may call for a veto or initiate a vote at any time." Lyon Decl. ¶ 29, Ex. 10.

16. Defendants allege that the NASKA Board voted unanimously on February 26, 2026 to convert "Unincorporated NASKA" into WTP, that rights transferred to WTP by operation of law on March 4, 2026, and that McCoy assigned the NASKA marks to WTP on March 26, 2026 with Board authorization. Doc. 61, First Am. Countercls. ¶¶ 71–74, 125. Defendants have not produced any assignment document or any document memorializing the alleged vote. But Mr. Carnahan, Mr. Lyon, and Mr. and Mrs. Brown did not participate in any such vote, would not have voted for it, remained NASKA Board members, and did not authorize McCoy to assign anything to WTP. Carnahan Decl. ¶¶ 75–77; Lyon Decl. ¶¶ 30–35; Brown Decl. ¶¶ 26–28. Mr. McCoy himself admitted at deposition that neither Mr. Carnahan, Mr. Lyon, nor Mr. and Mrs. Brown participated in the subsequent transfer vote. McCoy Dep. 167:9–20.

17. Rather, on February 26, 2026, the group discussed various issues and actions surrounding a problematic Robert LeClerc. Lyon Decl. ¶ 35.a, Ex. 14, Feb. 26, 2026 Mtg. Tr. 2:25–4:24, 16:30–19:23, 49:02–52:13. The only express "vote" requested during the meeting was whether anyone opposed listing their names and

events on a letter addressing LeClerc. Lyon Decl. ¶ 35.a, Ex. 14, Feb. 26, 2026 Mtg. Tr. 16:30–19:23. There was no vote to create WTP, convert any association, transfer trademarks, assign assets, adopt an operating agreement, or make anyone a member of WTP.

18. During the February 26, 2026 meeting, participants acknowledged that no legal entity existed to hold or transfer the NASKA marks. Sawyer stated that any policy could not "officially come from NASKA" unless it came from Mr. Carnahan because "he's the only one that's in the corporation," and recognized that the NASKA Executive Committee could not "represent itself as being part of NASKA Inc." Lyon Decl. ¶ 35.b, Ex. 14, Feb. 26, 2026 Mtg. Tr. 24:56–25:57, 32:51–33:42. McCoy stated that NASKA did not have "sanctioned contracts between NASKA, Inc., and the individual tournament" and that the group needed "a proper corporate structure to be able to enforce contracts." Lyon Decl. ¶ 35.c, Ex. 14, Feb. 26, 2026 Mtg. Tr. 8:20–8:33, 15:17–15:59. McCoy further stated: "NASKA can't make a statement. . . . We're not in a position." Lyon Decl. ¶ 35.d, Ex. 14, Feb. 26, 2026 Mtg. Tr. 7:36–8:20.

19. WTP described the supposed February 26 action as a "unanimous vote of all members who voted," not as a unanimous vote of all members. Doc. 69, Defendant's Brief in Opposition to Motion to Dismiss Amended Counterclaims, at p. 17.

20. On March 14, 2026—ten days after WTP's formation and eighteen days after the alleged conversion vote—McCoy wrote directly to Mr. Carnahan

referencing "your company NASKA Inc." and proposing a new LLC that would have "all 12 Promoters as equal members," acknowledging that such a structure did not yet exist. Carnahan Decl. ¶ 85, Ex. 14. This post-formation communication is irreconcilable with a conversion having already occurred.

21. Defendants nonetheless have used the NASKA marks without Plaintiff's authorization, including taking control and making unauthorized use of a Facebook and Instagram accounts that hold Defendants out as NASKA leadership and are likely to confuse the sport karate community and public. Carnahan Decl. ¶¶ 78, 86–92.

## II. UNDISPUTED MATERIAL FACTS

1. There was no unanimous vote to convert any unincorporated association into WTP.

2. There was no vote at all to convert any unincorporated association into WTP.

3. There is no statutory mechanism in Florida that permits conversion of an unincorporated association into a Florida limited liability company.

4. To the extent Florida partnership law applies, there is no "record" as required under Fla. Stat. § 620.8913(1) of a vote to convert any unincorporated association into WTP.

5. To the extent Florida partnership law applies, there is no "registration statement" as required under Fla. Stat. § 620.8914(1)(a) or "certificate of conversion" as required under Fla. Stat. § 620.8105 filed with the Florida

Department of State in connection with a conversion of any unincorporated association into WTP.

6. Mr. McCoy did not assign any rights in the NASKA marks or business from any unincorporated association to WTP.

## III. SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment when it can show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Gurzi v. Penn Credit, Corp.*, 449 F. Supp. 3d 1294, 1296 (M.D. Fla. 2020). "Which facts are material depends on the substantive law applicable to the case." *Gurzi*, 449 F. Supp. 3d at 1296 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"The moving party bears the burden of showing that no genuine issue of material fact exists." *Id.* at 1296 (citing *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991)); *see also St. Pauls Presbyterian Church, Inc. v. Westchester Surplus Lines Ins. Co.*, No. 6:22-cv-488-GAP-LHP, 2024 WL 1961492, at *2 (M.D. Fla. Jan. 11, 2024). In determining whether the moving party has satisfied its burden, the Court "'must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" *Id.* at 1296–97 (quoting *Hinson v. Clinch Cty., Ga. Bd. of Educ.*, 231 F.3d 821, 826–27 (11th Cir. 2000)); *see also St. Pauls*, 2024 WL 1961492 at *2.

"When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the nonmoving party bears the burden of

proof at trial, the nonmoving party must 'go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Id.* at 1297 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986)); *accord St. Pauls*, 2024 WL 1961492 at *2. "Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial." *Id.* (citing *Celotex*, 477 U.S. at 322, 324–25). "The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts." *Id.* (citing *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985)); *accord St. Pauls*, 2024 WL 1961492 at *2.

## IV. ARGUMENT

For purposes of this Motion only, and without conceding the point, NASKA Inc. assumes that an unincorporated association known as the "North American Sport Karate Association" or "NASKA" ("***U-NASKA***") existed and in February 2026 owned the NASKA marks and business. NASKA Inc. continues to maintain, for the reasons set forth above, that no such unincorporated association ever existed or owned the NASKA marks or business. But even accepting Defendants' characterization of U-NASKA for the sake of argument, the undisputed record establishes that no ownership interest in the NASKA marks or business could have ever passed from U-NASKA to WTP, for each of the independent reasons set forth below.

### A. WTP cannot establish it succeeded to any rights of the alleged unincorporated association because there was no unanimous vote to convert U-NASKA into WTP. There was no vote at all.

Transfer of property held by an unincorporated association, under either the common law governing such associations or Florida's partnership law, requires unanimous action. At common law, "an unincorporated association is not an entity, and has no status distinct from the persons composing it," and its property is beneficially owned in common by its members, who may manage, control, or dispose of it only by unanimous action. 6 Am. Jur. 2d Associations and Clubs §§ 1, 18; 3A Fla. Jur. 2d Associations and Clubs § 10; *see also Asociacion De Perjudicados Por Inversiones Efectuadas En U.S.A. v. Citibank, F.S.B.*, 770 So. 2d 1267, 1269 n.3 (Fla. 3d DCA 2000). Under Florida's Revised Uniform Partnership Act ("***FRUPA***"), the result is the same. A plan of conversion "must be consented to by all of the partners of a converting partnership." Fla. Stat. § 620.8913(1).

No such unanimous action occurred here. Mr. Carnahan, Mr. Lyon, and Mr. and Mrs. Brown—NASKA Board members on February 26, 2026—did not participate in, and would not have voted for, any vote to convert U-NASKA into WTP or transfer its assets, and never authorized Mr. McCoy to act on their behalf. Carnahan Decl. ¶¶ 75–77; Lyon Decl. ¶¶ 32–35; Brown Decl. ¶¶ 26–28. WTP's own pleading confirms the gap. It alleges the "NASKA Board as a whole voted unanimously," Doc. 61, First Am. Countercls. ¶ 71, yet its briefing describes the same event as a "unanimous vote of all members who voted"—an implicit concession that not all members voted. Doc. 69 at 17. Mr. McCoy's deposition

testimony only widens the gap. He testified that just eleven of the twelve promoter entities on the NASKA Board attended the February 26 meeting and that all eleven voted to "develop an LLC in Florida." McCoy Dep. 149:7–149:9. He then separately described a distinct, later "verbal vote" to transfer NASKA's assets that included only nine members and excluded Mr. Carnahan, Mr. Lyon, and Mr. and Mrs. Brown—each still a NASKA Board member. McCoy Dep. 165:4–12; 167:1–20. McCoy could not say when that second vote occurred, who called it, or identify any document memorializing it. McCoy Dep. 155:9–18. He further conceded that Larry Carnahan never consented to any assignment of rights to WTP. McCoy Dep. 172:15–19.

In fact, no vote to convert U-NASKA into WTP occurred on February 26, 2026 at all. The transcript of the meeting reveals that the group instead discussed issues surrounding a problematic Robert LeClerc, and the only vote taken concerned a letter about Mr. LeClerc—not any conversion, transfer, or membership in WTP. Lyon Decl. ¶ 35.a, Ex. 14, Feb. 26, 2026 Mtg. Tr. 2:25–4:24, 16:30–19:23, 49:02–52:13. The following day further confirms that no conversion had taken place: Mr. McCoy told the group, "we still think we stick with our plan of forming a separate company that licensed to NASKA, Inc.," envisioning the new entity as a licensee of NASKA Inc.—not its owner. Lyon Decl. ¶ 36.c, Ex. 15, Feb. 27, 2026 Mtg. Tr. 15:54–16:06; McCoy Dep. 80:23–81:6. Without the requisite unanimous vote, U-NASKA could never have converted into WTP, and as a result WTP has no rights in the NASKA marks or business to assert against NASKA Inc.

### B. Florida law provides no statutory mechanism for an unincorporated association to convert into a limited liability company.

WTP's conversion theory also fails because Florida law provides no statutory mechanism for an unincorporated association to convert into a limited liability company and thereby transfer trademark ownership by operation of law. Florida's conversion statutes are limited to specific statutory entity types—limited liability companies, corporations, limited partnerships, and general partnerships—and WTP's alleged U-NASKA was none of those. *See* Fla. Stat. §§ 605.1041–605.1046 (limited liability company conversions); 607.11930–607.11935 (corporation conversions); 620.2102–620.2105 (limited partnership conversions); 620.8911-620.8915 (general partnership conversions). Notably, FRUPA itself requires a "converting partnership"—*i.e.*, an already-existing statutory partnership—to file a plan of conversion. Fla. Stat. § 620.8913. An unincorporated association is not a partnership, and Florida's conversion provisions do not apply to it. WTP's allegation that the NASKA marks transferred to it "by operation of law" on March 4, 2026, Doc. 61, First Am. Countercls. ¶ 74, finds no support in any provision of Florida law. Indeed, Mr. McCoy himself confirmed at deposition that the Executive Committee never even discussed whether it had "the power and authority to assign or transfer to anybody else the ownership of the NASKA, North American Sport Karate Association trademark," testifying: "No, we never even talked about that." McCoy Dep. 148:7–11.

The promoters' own contemporaneous statements confirm they knew no Florida-recognized entity existed. On February 25, 2026, Mr. McCoy said the group had "no authority to do anything" because "[t]here has to be some kind of contract, employment or officer contract for elections or minutes or something that officially designates us as officers or directors of the company. There is nothing official," and Mr. Ruth agreed the group "cannot legally do anything as an organization until we get our organization legal." Lyon Decl. ¶ 34.a & 34.d, Ex. 13, Feb. 25, 2026 Mtg. Tr. 2:36–3:06, 6:03–6:49, 46:55–47:39. The next day, Mr. McCoy said NASKA lacked "sanctioned contracts between NASKA, Inc., and the individual tournament" and needed "a proper corporate structure to be able to enforce contracts," and Mr. Sawyer said the Executive Committee "can't represent itself as being part of NASKA Inc." Lyon Decl. ¶ 35.c, Ex. 14, Feb. 26, 2026 Mtg. Tr. 8:20–8:33, 15:17–15:59, 32:52–33:42.

Mr. McCoy's deposition confirms there was no statutory basis for the alleged conversion. He did not know "under what statutory authority" U-NASKA converted, testifying only that conversion "is automatic when you change from one organization to another." McCoy Dep. 32:12–17, 43:22–44:3. He did not know whether any filings were made with the Florida Department of State, McCoy Dep. 32:18–21; did not know the "legal mechanism" for the conversion despite testifying it occurred, McCoy Dep. 155:19–25, 157:24–158:9; and confirmed that no one on the Board obtained a legal opinion before the alleged vote to form the LLC. McCoy Dep. 159:10–17. Asked directly whether he knew Florida law provides no

conversion mechanism for an unincorporated association to become an LLC, he answered: "I was not aware." McCoy Dep. 159:5–9. Mr. McCoy further admitted he had no awareness that any board member ever objected to Mr. Carnahan's use of the NASKA marks through NASKA, Inc. over the preceding 36 years. McCoy Dep. 136:7–137:6.

Contemporaneous recordings corroborate this absence of any recognized legal structure. On February 25, Mr. McCoy told the group "[t]here is no board," (Lyon Decl. ¶ 34.a, Ex. 13, Feb. 25, 2026 Mtg. Tr. 56:27–57:00) and two days later Mr. Sawyer warned that "we just don't have a legal NASKA entity," proposing to "[c]reate the LLC" precisely because none yet existed. Lyon Decl. ¶ 36.a, Ex. 15, Feb. 27, 2026 Mtg. Tr. 1:20:54–1:21:49.

### C. Even under Florida partnership law, WTP cannot establish that any plan of conversion was consented to, or evidenced by, a "record" as Florida Statutes § 620.8913(1) requires.

Even assuming U-NASKA could be treated as a partnership under FRUPA, any plan to convert it into WTP required consent of all partners "in, or evidenced by, a record"—defined as "information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form." Fla. Stat. §§ 620.8913(1), 620.8911(10).

No such record exists. Mr. McCoy testified the alleged February 26 vote was conducted verbally on a Zoom call and was never transcribed: "I haven't seen it and I . . . couldn't find a copy of it." McCoy Dep. 148:22–149:17. Nor could he identify any writing memorializing the resolution supposedly passed at the later

transfer vote. McCoy Dep. 155:12–18. Mr. Carnahan, Mr. Lyon, and Mr. and Mrs. Brown confirm they neither consented to, nor received or created, any record of a conversion plan. Carnahan Decl. ¶¶ 75–77; Lyon Decl. ¶¶ 30–35; Brown Decl. ¶¶ 26–28.

The contemporaneous record confirms the gap. The day after the alleged vote, Mr. Sawyer told the group "there's nothing in writing about that[; t]hat's not a good thing. It doesn't make lawyers sleep well at night," Lyon Decl. ¶ 36.b, Ex. 15, Feb. 27, 2026 Mtg. Tr. 1:12:12–1:13:15, and no meeting minutes, resolution, or written consent appears anywhere in the February 25, February 26, February 27, or March 3, 2026 meeting transcripts, even though each extensively discussed NASKA's organizational structure, nor were any produced in discovery. Without the requisite "record," there could be no conversion, and WTP could thus have no rights to assert against NASKA Inc.

### D. WTP cannot establish that the registration statement and certificate of conversion required by Florida Statutes §§ 620.8914(1)(a) and 620.8105 were ever filed.

Even if U-NASKA's members unanimously consented to a recorded plan of conversion—which they did not—WTP still cannot show the conversion was effected as Florida law requires. A converting partnership must file, if not previously filed, a registration statement under Florida Statutes § 620.8105 and a certificate of conversion. Fla. Stat. § 620.8914(1)(a).

WTP has produced neither document, nor any evidence either was filed. Mr. McCoy did not know whether any filings were made with the Florida Department

of State or who would have made them, McCoy Dep. 32:18–33:7, and could not identify any document reflecting a statutorily compliant conversion. McCoy Dep. 228:14–20 ("[I]s there a document that says we have an unincorporated association that you found historically that owns these NASKA marks?" "No."). Without the requisite filings, there could be no conversion, and WTP could thus have no rights to assert against NASKA Inc.

**E. McCoy's alleged March 26, 2026 assignment cannot cure WTP's chain-of-title defect because McCoy lacked authority to assign anything, and no assignment occurred.**

WTP alleges that, "for the avoidance of doubt," Mr. McCoy expressly assigned the NASKA marks to WTP on March 26, 2026, with Board authorization. Doc. 61, First Am. Countercls. ¶ 125. Neither premise survives scrutiny. First, Mr. McCoy lacked authority. Acts outside the ordinary course of partnership business, such as assigning the partnership's core intellectual property, require authorization of all partners. Fla. Stat. §§ 620.8301(2), 620.8302(1). Mr. Carnahan, Mr. Lyon, and Mr. and Mrs. Brown each confirm they never authorized any assignment or authorized Mr. McCoy to act on their behalf. Carnahan Decl. ¶ 77; Lyon Decl. ¶ 41; Brown Decl. ¶ 28. Mr. McCoy conceded the same at his deposition, testifying that none of those individuals consented. McCoy Dep. 171:22–172:6. The Executive Committee itself lacked the power to make such a transfer; McCoy admitted the Committee never even discussed whether it had authority to assign the NASKA marks. McCoy Dep. 148:7–11. Nor was Mr. McCoy ever a shareholder, director, officer, or employee of NASKA Inc.—which owned the

marks by virtue of Mr. Carnahan's January 26, 2021 assignment—so he could not assign rights he did not own. Carnahan Decl. ¶¶ 55–64, 79. Mr. McCoy's own repeated, contemporaneous admissions that Mr. Carnahan alone owned and controlled NASKA, detailed above, conclusively foreclose any claim that Mr. McCoy possessed such authority.

Second, and independently, no assignment ever occurred. Mr. McCoy admitted he never signed a written assignment. Rather, he merely "stated" to the Board, in his capacity as WTP's president, that the marks "had been assigned." McCoy Dep. 168:10–13, 168:24–169:7. Pressed further, he confirmed: "I don't think I signed anything, but if [I] did, I . . . don't remember," and ultimately conceded, "there was no written assignment, correct?" "Correct." McCoy Dep. 168:15–16, 171:120–21. Asked whether Larry Carnahan told him he was okay with McCoy making the assignment, McCoy answered, "I don't believe I spoke to him, no." McCoy Dep. 171:22–172:2. He likewise confirmed that neither Hunter Lyon nor Dennis and Andrena Brown consented to the assignment. McCoy Dep. 172:3–6. An unsigned oral "statement" by someone who lacked authority to make it, without the consent of the purported members whose interests were being assigned, transfers nothing.

The contemporaneous record confirms authority remained with Mr. Carnahan alone. On February 27, Mr. Sawyer told the group that even Mr. Carnahan's cooperation could not create authority in the Executive Committee, let alone in Mr. McCoy individually: "Larry can't confer legal status on us. He can't

confer legal protection." Lyon Decl. ¶ 36.d, Ex. 15, Feb. 27, 2026 Mtg. Tr. 1:17:45–1:18:48. Mr. McCoy himself recognized Mr. Carnahan's control, acknowledging in the same period that the NASKA website "is owned by NASKA, Inc., Larry's company" and that "[w]e can't keep sending people to a site that he owns." McCoy Dep. 79:4–10. Consistent with these admissions, when Mr. Carnahan relinquished control of NASKA, Inc., he did so himself through a "buy-sell agreement and resolution" with Mr. Lyon—not through any assignment by Mr. McCoy—weeks before the alleged March 26 assignment. Lyon Decl. ¶ 37.b, Ex. 16, Mar. 3, 2026 Mtg. Tr. 12:53–13:11.

A person who repeatedly disclaimed any ownership or authority cannot credibly claim, days or weeks later, to have possessed the very authority he disclaimed. Even under Defendants' own association or partnership theory, Mr. McCoy lacked authorization from all purported members to transfer anything. Carnahan Decl. ¶ 77; Lyon Decl. ¶ 41; Brown Decl. ¶ 28. Moreover, Mr. McCoy conceded that he personally does not own the NASKA marks, McCoy Dep. 115:22–116:1, and that WTP's claimed basis for ownership is simply that the unincorporated association "[u]sed [the marks] in commerce since '86," McCoy Dep. 239:20—a claim of use, not a chain of title. Absent a valid conversion, and absent a valid assignment, WTP never received any rights in the NASKA marks or business it can assert against NASKA Inc.

## V. CONCLUSION

The undisputed material facts establish that: (i) there was no unanimous vote—or any vote—by the members of U-NASKA to convert U-NASKA into WTP; (ii) Florida law provides no statutory mechanism for an unincorporated association to convert into a limited liability company; (iii) even under Florida partnership law, WTP cannot show that any plan of conversion was consented to, or evidenced by, a "record" as Florida Statutes § 620.8913(1) requires; (iv) WTP cannot show that the registration statement and certificate of conversion required by Florida Statutes §§ 620.8914(1)(a) and 620.8105 were ever filed; and (v) Mr. McCoy lacked authority to assign the NASKA marks to WTP and, in any event, never executed any assignment. Because WTP cannot establish a chain of title from U-NASKA to itself through any legally cognizable mechanism, WTP has no ownership interest in the NASKA marks or business. Absent such ownership, each of WTP's eight Counterclaims fails as a matter of law: WTP cannot sustain a claim for unfair competition or false designation of origin (Count I) because it has no protectable mark to enforce; it cannot obtain cancellation of NASKA Inc.'s registration (Count II) because it has no prior rights; it cannot obtain a declaratory judgment of ownership (Count III) because it owns nothing; it cannot prevail on conversion of a bank account (Count IV) because the funds belong to NASKA Inc., not WTP; it cannot obtain an accounting or constructive trust (Count V) because it has no equitable interest in NASKA Inc.'s revenues; it cannot establish fraud on the USPTO (Count VI) because NASKA Inc. is the lawful owner of the mark it

registered; it cannot prove tortious interference (Count VII) because NASKA Inc. acted within its rights as the mark owner; and it cannot prevail under the Florida Deceptive and Unfair Trade Practices Act (Count VIII) because NASKA Inc.'s use of its own marks is neither deceptive nor unfair.

WHEREFORE, NASKA Inc. respectfully requests that the Court enter partial summary judgment in its favor and against WTP on all eight of WTP's Counterclaims (Counts I through VIII), dismissing each with prejudice, and declaring that WTP has no right, title, or interest in the NASKA marks or business.

Dated: August 7, 2026

Respectfully submitted,

/s/ J. Todd Timmerman
J. Todd Timmerman, Lead Counsel
Florida Bar No. 0956058
ttimmerman@shumaker.com
Mindi M. Richter
Florida Bar No. 0044827
mrichter@shumaker.com
Samantha A. Regala
Florida Bar No. 1032553
sregala@shumaker.com
Shumaker, Loop & Kendrick, LLP
101 East Kennedy Boulevard
Suite 2800
Tampa, Florida 33602
Telephone: 813-229-7760
Facsimile: 813-229-1660

*Counsel for Plaintiff, North American Sport Karate Association Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 7, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ J. Todd Timmerman
J. Todd Timmerman